The STATE of Ohio, Appellee,

v.

BROCK, Appellant.

[Cite as *State v. Brock* (1996), 110 Ohio App.3d 656.]

Court of Appeals of Ohio,
Third District, Shelby County.

No. 17–95–3.

Decided April 26, 1996.

*James F. Stevenson,* Shelby County Prosecuting Attorney, for appellee.

*W. Edward Hatcher* and *Gregory W. Donohue,* for appellant.

HADLEY, Presiding Judge.

Defendant-appellant, Daniel Brock, appeals from the judgments of conviction and sentencing entered in the Shelby County Court of Common Pleas, finding him guilty of aggravated murder with a death specification and a gun specification, a violation of R.C. 2903.01, and aggravated robbery with a gun specification, a violation of R.C. 2911.01. The trial court, upon review of the evidence

presented, agreed with the recommendation of the jury that appellant be sentenced to death. Thus, the trial court sentenced appellant to death for the aggravated murder violation, ten to twenty-five years for the aggravated robbery violation, and three years of actual incarceration for each of the two gun specifications, all to run consecutively.

Appellant timely filed a notice of appeal from the trial court's entries of conviction and sentencing. A recitation of the relevant facts is limited to those necessary to our disposition of this appeal.

On March 31, 1994, the Shelby County Grand Jury returned an indictment against appellant for one violation of R.C. 2903.01, aggravated murder, with death and gun specifications, and one violation of R.C. 2911.01, aggravated robbery, with a gun specification. Appellant was arrested on the same day pursuant to the indictment. At appellant's arraignment on April 8, 1994, a not guilty plea was entered on his behalf. On June 7, 1994, appellant waived his right to a speedy trial.

On August 31, 1994, appellant filed a motion to change venue and a motion to suppress statements appellant made to law enforcement persons on the date of his arrest. The trial court overruled both motions. The venue motion was overruled as being premature. The suppression motion was overruled because the trial court found, based upon the totality of the circumstances, that appellant had knowingly, willingly, and voluntarily made statements to law enforcement personnel on the date of his arrest.

On October 20, 1994, appellant, appearing in open court, waived his right to a trial by jury, and elected to be tried by a three-judge panel, pursuant to R.C. 2929.022.

On November 18, 1994, appellant withdrew his waiver of his right to a trial by jury and requested a trial by jury.

Trial began on November 29, 1994. The trial court and the parties proceeded with voir dire on November 29 and November 30. On December 1, 1994, the parties exercised their peremptory challenges, and a jury consisting of twelve members and two alternates was chosen and sworn. Prior to the jury being sworn, defense counsel objected to the use of the prosecutor's peremptory strikes, on the bases of intentional racial and gender discrimination.

After the jury was sworn, court was recessed. After the recess, the parties placed on the record an arrangement that had been discussed during the recess. The arrangement was that appellant would tender a no contest plea to the charges in the indictment and would have a jury make a recommendation as to the penalty to be imposed. The court accepted appellant's no contest plea and made a finding of guilty as to the charges in the indictment. The jury

reconvened, heard the evidence on the factors to determine the penalty, and, on December 7, 1994, recommended death.

In the judgment entry of December 12, 1994, as subsequently amended on December 14, 1994, the trial court imposed the death penalty as recommended and sentenced appellant as noted above.

It is from these judgments that appellant asserts eighteen assignments of error.

### Assignment of Error No. 1

"The trial court erred in substantially deviating from the requirements of Crim.R. 11 and R.C. 2945.06."

As set forth above, appellant first waived his right to a jury trial and requested a trial by a three-judge panel on October 20, 1994. Appellant subsequently withdrew this waiver on November 18, 1994, and, on that date, requested a jury trial.

After the jury was sworn and prior to opening statements, appellant announced that despite "some quirks" he was withdrawing his not guilty plea and with the state and counsel for appellant making "some extensions under Rule 11," appellant was tendering a plea of no contest in his "trial on the guilt or innocent phase" to aggravated murder with death specification, aggravated robbery, and two gun specifications. At that time, appellant reserved his right to trial by jury as to the penalty phase. The prosecution indicated its willingness to proceed in that manner, stating:

"It's our understanding in examining Criminal Rule 11 that when a Defendant pleads guilty or no contest to aggravated murder with a death specification that by doing so he waives his right to a jury trial and then the mitigation hearing is determined by a three judge panel. We have agreed that even though the rule provides that that plea provides for a waiver of a jury trial, that we are prepared and we do agree to permit that mitigation hearing to go to the jury as opposed to a three judge panel.

"In our discussions we—we don't believe that there's any error in that—in that. In effect, we are providing to the Defendant for—of a right to have a hearing by jury than what the rule actually provides for."

The trial court then stated:

"Well, Mr. Brock, if this is—if this is the manner in which you want to proceed, you have every right, if you want to, to enter a plea of no contest as charged."

The court then reviewed with appellant certain constitutional rights including the right to a jury trial for the guilt or innocence phase, the right to have the

state prove guilt beyond a reasonable doubt, the right to confront accusers, compulsory process, and the right against self-incrimination. The court explained the possible penalties to appellant and inquired as to the voluntariness of his plea. The court accepted appellant's plea of no contest and subsequently received a statement of facts from the state. Thereafter, the trial court found appellant guilty of aggravated murder with a specification and aggravated robbery with a specification.

Appellant now states that the trial court erred in that the procedure employed was contrary to the statutory death penalty scheme and the Ohio Rules of Criminal Procedure and therefore permitted the arbitrary and capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Sections 9, 10, and 16, Article I of the Ohio Constitution.

R.C. 2945.06 states:

"In any case in which a defendant waives his right to trial by jury and elects to be tried by the court under section 2945.05 of the Revised Code, * * * [i]f the accused is charged with an offense punishable with death, he *shall* be tried by a court to be composed of three judges * * *. The court *shall* follow the procedures contained in sections 2929.03 and 2929.04 of the Revised Code in all cases in which the accused is charged with an offense punishable by death. * * * " (Emphasis added.)

R.C. 2929.03(C)(2)(a) provided that the penalty to be imposed after a finding of guilty to such a charge with specifications *shall* be determined "[b]y the panel of three judges that tried the offender upon the offender's waiver of the right to trial by jury."

Crim.R. 11(C)(3) provides in paragraph four:

"If the indictment contains one or more specifications which are not dismissed upon acceptance of a plea of guilty or no contest to the charge, or if pleas of guilty or no contest to both the charge and one or more of the specifications are accepted, a court composed of three judges *shall*: (a) determine whether the offense was aggravated murder or a lesser offense; and (b) if the offense is determined to have been a lesser offense, impose sentence accordingly; or (c) if the offense is determined to have been aggravated murder, proceed as provided by law to determine the presence or absence of the specified aggravating circumstances and of mitigating circumstances, and impose sentence accordingly." (Emphasis added.)

Appellant argues that the requirements of Crim.R. 11 were never explained to him. During the hearing on his change of plea, the trial court did not sufficiently detail the procedures regarding the entering of the no contest plea and the

ramifications. On October 19, 1994, the trial court explained to appellant the procedure if he chose to waive his right to be tried by a jury:

"THE COURT: You also have the right—because this is a what we refer to as a capital murder case, you also have the right, if you choose, to waive that right to be tried by a jury and rather to be tried by a three-judge panel.

"That three-judge panel—one of those judges will be me and then there will be two other judges that I will select to hear this case, and it will be the three-judge panel that will then decide your guilt or innocence and further decide any mitigation matters. Are you aware of all that?

"THE DEFENDANT: Yes sir."

However, the proceedings were subsequently altered, and when appellant later chose to waive the jury as to the guilt or innocence phase only, this language was not repeated at that time to ensure appellant's understanding.

Evidently, the participants themselves must have sensed some potential problem with the course of the proceedings because on December 6, 1994, prior to commencing closing arguments in the mitigation phase to the jury, the court, in chambers, held an additional hearing "to make sure that we've put on the record or certainly clarified the position of the defendant and the prosecution as to our procedure in this matter." The court then explained how they were "deviating a little bit from the procedure that may be outlined in Criminal Rule 11" but that it was "at the request of the defendant" and the additional hearing was to make "it very clear on the record why we are proceeding in this fashion."

The prosecution then pointed out:

"[B]ecause the Defendant wished to have his mitigation hearing before the Jury that had been selected, he is prepared to waive any defects or any irregularities or anything that would have been done by the three-judge panel in exchange for the procedure we followed to this point in time."

Defense counsel added:

"Your Honor, we believe, as the Prosecutor has accurately stated it, that the waivers are—are constitutionally firm for—for Danny and—and that he did this knowingly, intelligently, and voluntarily; and his selection to plead no contest and keep the Jury to hear the mitigation was an accommodation that was made by all parties under sealed agreement, which we have previously placed in the record. We'd like the Court to accept that, continue the process."

Next, the trial court personally inquired of appellant if he understood that once he entered the no contest plea that the procedure "could have been at that time that a three-judge panel proceed to—to finish this case and determine life or death." Appellant stated that he understood; however, he did not want a three-

judge panel to determine whether he would be sentenced to life imprisonment or death, but rather he wanted a jury to make that determination. The guilt or innocent phase was not discussed at that time.

Thus, while it is clear that appellant understood and accepted the proceedings after the guilt phase was concluded, a question remains as to whether appellant actually understood that the required procedure upon entering a no contest plea was to have a three-judge panel review the matter and make a finding of guilt or innocence.

▉ Waivers of rights not only must be voluntary, they must also be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences. *Brady v. United States* (1970), 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747. Therefore, even if the waiver is one that can be properly exercised, there is a question as to whether appellant understood the required procedure regarding the guilt or innocence phase.

The state argues that the most basic rights of a defendant are subject to waiver and that since a defendant may waive constitutional protections he should be able to waive statutory provisions by agreement. The prosecution also states that in waiving the statutory provision to have his mitigation case heard by a three-judge panel, appellant preserved a far more fundamental right, the right to trial by jury. Further, it is argued that since appellant's fate was determined by a jury, no facts tried by a jury should be reexamined.

▉ Nevertheless, while an accused may waive certain constitutional rights, there are other fundamental matters such as proceedings essential to jurisdiction which an accused may not waive. As stated in *Goodin v. State* (1865), 16 Ohio St. 344, at 345:

"It is well settled that whatever is prescribed by the constitution and laws of the state to be done in prosecutions for crimes, is essential to the jurisdiction and power of the court to convict, and can neither be omitted nor waived."

Crim.R. 11 and R.C. 2945.06 require when a plea of no contest is accepted to both the charge and one or more specifications, that a panel of three judges *shall* make the determination as to the guilt of the accused and, if guilty, whether the offense was aggravated murder or a lesser offense and impose sentence accordingly. There is no provision for a single trial judge to make that determination.

The death penalty procedures provide that the three-judge panel actually review the facts regarding the charges and specification and reach a unanimous decision regarding guilt. Permitting a single judge court to make the determination removes one of the safeguards provided by law in the death penalty procedure. The United States Supreme Court and the Supreme Court of Ohio

have both required strict adherence to the precise legislatively defined procedures to prevent the arbitrary and capricious imposition of the death penalty. *State v. Penix* (1987), 32 Ohio St.3d 369, 513 N.E.2d 744. In imposing "some quirks" and "some extensions under Rule 11" the trial court has removed standards established by the legislature after the United States Supreme Court invalidated capital punishment in Ohio in *Furman v. Georgia* (1972), 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346.

There being no provision for a single-judge court to determine the guilt or innocence of the accused after a no contest plea in a death penalty case, the trial judge lacked jurisdiction to do so, and the finding of guilty is thus void as are the subsequent jury proceedings regarding the mitigation of penalty phase. A judgment of conviction is void if rendered by a court having no jurisdiction. It is the function and duty of a court to apply the law as written and occasionally construe statutes, but not to defeat them. Any attempt by a court to disregard mandatory statutory requirements of a proceeding regarding jurisdiction renders the attempted proceeding void even if the court believes it is acting upon a request of an accused. *State v. Perry* (1967), 10 Ohio St.2d 175, 39 O.O.2d 189, 226 N.E.2d 104.

The judgment having been determined to be void *ab initio* for want of jurisdiction of the trial court, we do not find that appellant was in jeopardy on the offense, and the cause must be remanded to the trial court to proceed as if no plea has been entered. *State v. Wilson* (1995), 73 Ohio St.3d 40, 652 N.E.2d 196; *United States v. DiFrancesco* (1980), 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328.

Appellant's first assignment of error is sustained.

The bulk of appellant's remaining assignments of error are rendered moot by our disposition of the first assignment of error. However, we do review three assignments of error for the purposes of addressing and clarifying any further, and future, problems involved with the jury originally selected (Assignment of Error No. 10) and of addressing those assignments that raise error in a procedure that occurred prior to the jury selection process (Assignments of Error Nos. 11 and 18).

## Assignment of Error No. 10

"The prosecutor's discriminatory use of peremtory [*sic*] challenges violated defendant Brock's Sixth Amendment guarantee of a fair cross section in his petit jury, the Fourteenth Amendment's Equal Protection Clause and Article I, Sections 10 and 16 of the Ohio Constitution."

In appellant's tenth assignment of error, he argues that the prosecutor violated appellant's Sixth Amendment right to a fair cross-section of petit jurors and his

Fourteenth Amendment right to equal protection by the prosecutor's intentional discriminatory use of peremptory challenges.

▮▮▮▮ As his first basis for this assignment, appellant argues that the prosecutor exercised one of his six peremptory challenges to excuse the only African–American member in the venire. In *Batson v. Kentucky* (1986), 476 U.S. 79, at 89, 106 S.Ct. 1712, at 1719, 90 L.Ed.2d 69, at 82–83, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." Thus, *Batson* established that a criminal defendant can demonstrate a violation of his equal protection rights pursuant to the Fourteenth Amendment to the United States Constitution by a showing that the prosecutor's use of peremptory challenges at the defendant's trial was used to purposely exclude members of the defendant's race. In *Powers v. Ohio* (1991), 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411, the United States Supreme Court extended its holding in *Batson* by holding that the race of the defendant is irrelevant to the defendant's right to challenge the prosecutor's use of peremptory challenges in a racially discriminatory manner. The Supreme Court also extended its holding to allow prosecutors to assert a *Batson* challenge to the defense's exercise of his peremptories. *Georgia v. McCollum* (1992), 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33. Civil litigants are also permitted to assert *Batson* claims. *Edmonson v. Leesville Concrete Co.* (1991), 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660.

▮▮▮ In *Batson,* the United States Supreme Court delineated the three steps an opponent of a peremptory challenge must follow to establish racial discriminatory use of the strike. First, the opponent of the peremptory challenge must make out a prima facie case of racial discrimination. Once the opponent has made out a prima facie case of intentional discrimination, the second step of the test shifts the burden of production to the proponent of the peremptory challenge to come forward with a race-neutral explanation of the strike. Third, if the proponent tenders a race-neutral explanation, the trial court must decide if the opponent has proved purposeful racial discrimination. *Batson, supra; Purkett v. Elem* (1995), 514 U.S. ——, 115 S.Ct. 1769, 131 L.Ed.2d 834.

▮▮▮ To determine if a violation of appellant's constitutional rights has occurred, we must apply the test delineated in *Batson* to the facts of the case. As noted above, only one African–American person was part of the jury venire and the prosecutor exercised one of his peremptory challenges to exclude this potential juror. Defense counsel timely objected to the prosecutor's exercise of this peremptory prior to the jury being sworn.

The first determination usually is whether or not appellant established a prima facie case of intentional discrimination. In *Batson, supra,* 476 U.S. at 96, 106

S.Ct. at 1723, 90 L.Ed.2d at 87–88, the Supreme Court set forth the requirements for a defendant to establish a prima facie case of intentional discrimination:

"To establish such a case, the defendant must first show that he is a member of a cognizable racial group * * * and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination."

The *Batson* majority provided some examples of "any other relevant circumstances" to demonstrate a prima facie case of intentional discrimination, including a showing of a pattern of strikes against the discriminated group, the questions and statements of the prosecutor during voir dire, and the prosecutor's exercise of his peremptories.

However, the issue of whether or not appellant established a prima facie case of intentional discrimination need not be a subject of our review. In *Hernandez v. New York* (1991), 500 U.S. 352, at 359, 111 S.Ct. 1859, at 1866, 114 L.Ed.2d 395, at 405, the United States Supreme Court stated:

"Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." See, also, *State v. Hernandez* (1992), 63 Ohio St.3d 577, 589 N.E.2d 1310.

Here, the prosecutor offered an explanation and the trial court ruled on the question of intentional discrimination in response to appellant's *Batson* objection. Thus, we proceed to the second step of the *Batson* inquiry to determine whether the prosecutor presented to the trial judge a race-neutral explanation for the strike.

A discussion between the judge, defense counsel, appellant, and the prosecutor occurred as follows:

"MR. ZIMMERMAN: * * *

" * * * [W]e're objecting to the exercise of peremptory challenge of juror number six, Mrs. Merritt.

"The record should reflect of the 70 people summoned in for jury duty there was one minority amongst them and that was Mrs. Merritt. She's also a female, and we think the exercise of the peremptory challenge by the State violates the United States Supreme Court guidelines set forth in—

"MR. LURING: *Batson v. Kentucky.*

" * * *

"THE COURT: Mr. Stevenson [prosecutor], do you wish to respond?

"MR. STEVENSON: Sure, Your Honor, and I anticipated this happening.

"Of course, it has nothing to do with her being a minority, being black, it has nothing to do with her being a female. We have lots of females on the jury. But it was a decision that we made based upon some intangibles I guess.

"My notes indicate that I note her down as she was a nice grandmotherly type, that I noticed some hesitation in her questioning about her willingness to consider the death penalty. Some of the information provided about her background and her number of children she had, things like that, made us believe that she would be perhaps somewhat reluctant to consider the arguments of the State; and she was considered and the peremptory used on her was used, just as we have used other peremptories, to give to the State what we believe to be a fair and impartial jury that will evenly weigh the evidence. It has absolutely nothing to do with her race."

In *Purkett,* 514 U.S. at ——, 115 S.Ct. at 1771, 131 L.Ed.2d at 839, the Supreme Court noted:

"The second step of this process does not demand an explanation that is persuasive, or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' *Hernandez* [*v. New York* (1991) ], 500 U.S. [352], at 360, 111 S.Ct. [1859] at 1866 [114 L.Ed.2d 395 at 406] * * *.

" * * * It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." (Emphasis *sic.*)

Moreover, the *Batson* court, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88, noted that "the prosecutor's explanation [in the second step] need not rise to the level justifying exercise of a challenge for cause."

The trial court decided, in step three of the *Batson* test, that appellant had not proved intentional racial discrimination because the prosecutor had provided a race-neutral explanation for his strike of the African–American juror. Therefore,

the trial court overruled appellant's objection and permitted the state to strike the African–American female from the jury.

A trial court's decision on the ultimate question of intentional discrimination (step three) is a finding of fact and is to be afforded great deference by a reviewing court. *Batson, supra,* fn. 21. Such a decision will not be overturned unless clearly erroneous. *Hernandez v. New York; State v. Hernandez, supra.*

We find no error in the trial court's finding that the prosecutor tendered a race-neutral explanation of the peremptory used for Merritt because the explanation given was not peculiar to any race, to wit, "hesitation * * * about her willingness to consider the death penalty" and "information provided about her background and her number of children * * * made us believe that she would be perhaps somewhat reluctant to consider the arguments of the State." *Purkett,* 514 U.S. at ——, 115 S.Ct. at 1771, 131 L.Ed.2d at 840, relying upon *Equal Emp. Opportunity Comm. v. Greyhound Lines, Inc.* (C.A.3 1980), 635 F.2d 188, 190, fn. 3.

Appellant also argues in this assignment that the prosecution intentionally discriminated against females in the exercise of his peremptories, which denied appellant a fair trial and equal protection. Following voir dire of the jurors the prosecutor and defense counsel were permitted seven peremptory challenges. The prosecutor used all seven of his peremptories to strike seven women from the jury.

In addressing this argument guidance is found in *J.E.B. v. Alabama ex rel. T.B.* (1994), 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89. In *J.E.B.,* the United States Supreme Court extended its holding in *Batson* to forbid the use of peremptory challenges by the state to exclude potential jurors on the basis of gender. In so doing, the court indicated that for a trial court to make a determination of whether or not the state's exercise of peremptory challenges to strike veniremembers on the basis of gender violates the Fourteenth Amendment to the United States Constitution, the *Batson* test is employed. Thus, the opponent of the peremptory must make a prima facie showing of intentional gender discrimination before an explanation by the proponent is required. If the opponent makes such a prima facie showing, the burden shifts to the prosecution to give a nonpretextual explanation for the strike. Once the proponent tenders a gender-neutral explanation, the trial court must decide if the opponent has proved purposeful gender discrimination. *Batson; J.E.B.; Purkett, supra.*

Following the exercising of peremptories by both the prosecution and the defense herein, defense counsel timely objected to the prosecution's use of all seven of its peremptory challenges against females. The venire consisted of

thirty persons—fifteen men and fifteen women. The jury selected consisted of eight men, four women, and two men as alternates.

■ We need not review whether or not appellant established a prima facie case of intentional discrimination of females by the prosecutor because the prosecutor offered an explanation for the strikes and the trial court ruled on the ultimate question of intentional discrimination. Therefore, this issue is moot. *Hernandez v. New York; State v. Hernandez, supra.*

Thus, we turn to the second step of the intentional discrimination test to determine whether the prosecutor offered a gender neutral explanation for his actions. Relevant to this issue is the following colloquy:

"MR. ZIMMERMAN: We want the record to reflect that all seven of the State's challenges were women and, therefore, we feel that the plan on the Prosecutor's behalf was to eliminate all minorities, which would include women.

"We think that is a violation of due process rights of Mr. Brock, and we further renew our motions to—for a mistrial and for sanctions because of the capricious matter in which the challenges were taken.

"THE COURT: Do you wish to respond?

"MR. STEVENSON: To be honest, I didn't even realize that was the case. *I don't know what to tell you other than it was not because of gender that those persons were excused.* As a matter of fact, although it so happened that one of the men that we were going to excuse they excused. So—so we didn't have to use a peremptory on that particular juror. So—

"THE COURT: The court has listened to the peremptory challenges and doesn't find there's any scheme or doesn't feel there was a plan to exclude minorities; and again, with the realm of the discretion of the appropriate challenges, the court feels the party should have that right; and, therefore, will overrule your objection and will preserve your exceptions for the record." (Emphasis added.)

In *Purkett, supra,* 514 U.S. at ——, 115 S.Ct. at 1771, 131 L.Ed.2d at 840, the Supreme Court stated that a prosecutor could not satisfy his burden of production of a gender-neutral explanation "by merely denying that he had a discriminatory motive or by merely affirming his good faith." See, also, *Batson, supra,* 476 U.S. at 94, 98, 106 S.Ct. at 1721, 1723–24, 90 L.Ed.2d at 86, 88. In the matter *sub judice,* this is exactly what the prosecutor did. The prosecutor merely denied that gender was the reason for excusing the seven veniremembers. Thus, based on the absence of any gender-neutral explanation for its exercise of all seven of its peremptories against females, we hold that the prosecutor did not carry its

burden to produce a gender-neutral explanation for the exercise of its peremptories.

Our next inquiry is to determine the appropriate remedy for the *Batson* violation. In *Batson*, 476 U.S. at 99, 106 S.Ct. at 1724–1725, 90 L.Ed.2d at 89, the Supreme Court declined to "formulate particular procedures" to be followed by state and federal courts when a prima facie case of intentional discrimination has been established and the prosecutor has failed to come forth with a gender-neutral explanation for the strikes. Moreover, at footnote 24 of *Batson*, the court stated:

"In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reason, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case * * * or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire."

All of the cases reviewed by us for assistance in our disposition of this assignment of error, having found prejudicial error herein, have been guided by the Supreme Court's disposition of the *Batson* case. The trial court in *Batson* summarily overruled defense counsel's objection to the prosecutor's use of its peremptories to remove all the African–Americans from the venire, and never required an explanation from the prosecutor for his action. The Supreme Court remanded the case to determine if a prima facie case of intentional discrimination existed, and if so, then an opportunity for the prosecutor to offer a race-neutral explanation for his actions. Further, if the prosecutor failed to provide a race-neutral explanation when given the opportunity to do so, then the conviction would be required to be reversed.

In our review of Ohio cases that have found error in a *Batson* claim, we have found three relevant appellate cases and find that these Ohio cases are aligned with the majority of federal and state jurisdictions: *State v. Tuck* (1992), 80 Ohio App.3d 721, 610 N.E.2d 591; *State v. Belcher* (1993), 89 Ohio App.3d 24, 623 N.E.2d 583; *State v. Singfield* (Jan. 26, 1994), Summit App. No. 16253, unreported, 1994 WL 30482.

In *Tuck,* the Tenth District Court of Appeals determined that the defendant had established a prima facie case of purposeful discrimination but that the trial court had not given the prosecutor an opportunity to come forward with a race-neutral reason to explain the exercise of his peremptories. Therefore, the *Tuck* court determined that because the prosecutor had not been given the opportunity

to provide an explanation, the case would be remanded for a hearing on this issue. *Id.,* 80 Ohio App.3d at 725, 610 N.E.2d at 594. The case *sub judice* differs from *Tuck,* because herein, the prosecutor was given the opportunity to offer a gender-neutral explanation for the exercise of its peremptories.

In *Belcher* and *Singfield,* the Tenth and Ninth District Court of Appeals, respectively, found that where the proponent of the strike was given the opportunity to defend its action by offering a race-neutral explanation and the proponent did not, or could not, offer a race-neutral explanation for its strike, the defendant would be afforded a new trial.

The majority of jurisdictions are in agreement with the *Tuck* disposition in cases in which the prosecutor was not given the opportunity to offer a race- or gender-neutral explanation. These jurisdictions remanded the case for the trial court to hold a *Batson* hearing. Once the hearing is held the trial court is to make a determination of whether or not the prosecutor engaged in intentional discrimination in the exercise of its peremptories. See *Wright v. State* (1988), 186 Ga.App. 104, 366 S.E.2d 420; *Saadiq v. State* (Iowa 1986), 387 N.W.2d 315; *State v. Hood* (1987), 242 Kan. 115, 744 P.2d 816; *Dedeaux v. State* (Miss.1988), 519 So.2d 886; *Williams v. State* (Miss.1987), 507 So.2d 50.

Moreover, the majority of jurisdictions are in agreement with the dispositions afforded in *Belcher* and *Singfield* providing the defendant with a new trial when the prosecutor did not provide a race- or gender-neutral explanation when given the opportunity to do so (a *Batson* hearing was conducted). See *United States v. Cunningham* (M.D.N.C.1988), 713 F.Supp. 165; *People v. Charles* (1992), 238 Ill.App.3d 752, 179 Ill.Dec. 771, 606 N.E.2d 603; *People v. Blunt* (1991), 176 A.D.2d 741, 574 N.Y.S.2d 812; *Brooks v. State* (Tex.Crim.App.1991), 802 S.W.2d 692; *Tolbert v. State* (1988), 315 Md. 13, 553 A.2d 228; but, see, *State v. Bell* (Tenn.1988), 745 S.W.2d 858.

We agree with the Ohio appellate cases and the majority of jurisdictions in their respective dispositions of these issues. If a prosecutor *has been given the opportunity* to state his reasons on the record why he used his peremptories after a prima facie case of intentional discrimination has been established by the defendant and fails to set forth gender-neutral reasons for them, then the defendant is entitled to a new trial. However, if the prosecutor was *never given the opportunity* to defend his use of peremptories, then the case should be remanded to permit the prosecutor to set forth a gender-neutral reason for them. If the prosecutor fails to tender such an explanation, then the defendant, based upon a review of all the facts and circumstances, should be entitled to a new trial.

Therefore, applying the law to the facts herein, we hold that appellant is entitled to a new trial because of the reasons set forth in the first assignment

of error and, as an additional basis, because the prosecutor, when given the opportunity to explain his reasons for exercising all seven of his peremptories against seven females, failed to provide a gender-neutral reason for so doing. The prosecutor's only statement [1] for all seven peremptories was that "it was not because of gender that those persons were excused."

We provide one cautionary note, however, that each claim of intentional discrimination in a party's exercise of its peremptory challenges is specific to the facts of that case, and the remedy we now provide appellant should be used as a guideline, not a hard and fast rule to be applied in every case.

Appellant's tenth assignment of error is sustained.

### Assignment of Error No. 11

"The trial court erred in denying appellant Brock's motion for change of venue."

On August 31, 1994, appellant moved the trial court to change the venue of his trial from Shelby County to a different jurisdiction, stating that because of the "wide detailed media coverage" of Brock's alleged involvement in the case, there was a substantial likelihood that appellant would be denied a fair and impartial jury and trial. On September 30, 1994, the trial court overruled this motion, and stated that whether a prospective juror's view of the case had been tainted by pretrial publicity could best be determined *upon examination of the jurors,* and not prior to trial. The record indicates that appellant did not again move for a change of venue during, or after, voir dire.

The granting of a motion for change of venue is within the sound discretion of the trial court. Crim.R. 18(B); *State v. Booher* (1988), 54 Ohio App.3d 1, 560 N.E.2d 786.

■ We find no error in the trial court's decision to deny appellant's motion for a change of venue two months before trial. The trial court's basis for its decision, because the effect of the pretrial publicity on prospective jurors can best

---

1. As noted above, the prosecutor did provide a race-neutral explanation for one of the seven jurors, the sole African–American female, during the *Batson* hearing in response to the allegation that he was exercising his peremptories to exclude an African–American person. However, the prosecutor never offered any explanation at the time appellant objected to the exercise of the prosecutor's peremptories to exclude females. Regardless of whether the race-neutral explanation can be applied to the gender objection, the fact remains that the prosecutor never offered any explanation for the strikes against all females when given the opportunity to do so. The striking of one veniremember that is a member of a cognizable racial or gender group without a neutral explanation for so doing results in a *Batson* or *J.E.B.* violation even where neutral explanations are given for other veniremembers of a cognizable racial or gender group that are stricken. *Belcher; Tolbert, supra.*

be determined only upon an examination of the prospective jurors, is well reasoned, and, therefore, we find no merit in this assignment of error.

Appellant's eleventh assignment of error is overruled.

### Assignment of Error No. 18

"The trial court erred in not suppressing defendant-appellant's statement for the reason that said waiver and statement was not made knowingly, intelligently, and voluntarily, denying him his fundamental rights to counsel, against self-incrimination, and due process, under both the U.S. and Ohio Constitutions."

Appellant, age eighteen, was arrested on March 31, 1994, for aggravated murder with a death specification. He was interrogated for over an hour. On August 31, 1994, appellant filed a motion to suppress the statements he made during that interrogation. Although appellant had executed a waiver of his *Miranda* rights, he claims that the waiver and statements were not knowingly, intelligently, and voluntarily made and that the statements should have been suppressed from evidence by the trial court.

Once the admissibility of a statement is challenged, the prosecution must prove its voluntariness by a preponderance of the evidence. *Lego v. Twomey* (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618. A statement is deemed voluntary if a reviewing court, examining the totality of the circumstances under which it is made, determines that the statement was not the result of official coercion or improper inducement.

The trial court held a hearing on the motion on September 26, 1994. Detective Doug Schlagetter testified that appellant was arrested at his residence and was transported to the sheriff's office. Schlagetter and Detective Joannie Henry escorted appellant upstairs in the old jail to the booking room to do an interview. Once in that room, appellant was seated at a desk, his handcuffs were removed, the officers introduced themselves, and appellant was advised of his *Miranda* rights by reading them from a card (marked as Exhibit 1). The officers checked off each of the six points from the card as it was read to appellant. Appellant was asked if he understood each point after it was read to him, and he responded in the affirmative, either verbally or with a nod. After all the points were read, appellant was asked if he understood each of the rights and if he wished to talk to the officers. Appellant responded by asking how long it would take for one to get there (evidently referring to an attorney), and Schlagetter responded by inform-ing appellant that he did not know how long it would take, but if appellant would like to have an attorney, the officers would call one for him. Appellant stated that he did not need one, and Schlagetter told him he would go ahead and turn on the tape recorder. (Appellant signed the waiver form at 11:12 a.m.) A copy of the taped interview and a written transcript were marked as exhibits.

During the interview, appellant did not ask for an attorney. The prosecuting attorney arrived about thirty minutes into the interview but took no active part in the interviewing.

Appellant claims that his statements were not voluntary because it was not until well into his statements that he was fully aware of the ramifications of the charges against him and that he was facing the death penalty. Additionally, appellant states that the officers made promises to him to induce him to make statements. He was told that he would benefit from telling the truth, that the prosecution would not plea bargain with him unless he cooperated, and further that if he did cooperate, they would tell the judge, insinuating that this would help his case. It was also pointed out to him that the first one to confess has the opportunity to obtain a lawyer first and go to court first, and is thus better off in the legal system. Appellant states that all of these taken together amounted to psychological coercion which should have rendered the statements as involuntarily made.

The trial court, after the hearing, found that appellant's arguments were not persuasive. The court found that appellant knowingly and willingly waived his *Miranda* rights to speak with an attorney and voluntarily agreed to talk to the officers. The setting was not coercive, and the interview was not unduly long, considering the seriousness of the charge.

▮▮▮▮ We agree with those findings of the trial court and further agree that the facts of this case do not approach those explained in *State v. Arrington* (1984), 14 Ohio App.3d 111, 14 OBR 125, 470 N.E.2d 211, wherein the accused, by means of direct or indirect promises and misstatements of the law, was given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution, or court in consideration of making a statement. As the court found herein, at no time did the officers indicate to appellant that he would be treated more leniently if he was truthful, and the urging to appellant to be truthful was nothing more than a benefit which "flows naturally from a truthful and honest course of conduct."

Appellant waived his *Miranda* rights after he had been arrested, had seen the warrant for his arrest, and knew that he was facing a very serious charge. He stated that he did not need an attorney and parried with the police for over an hour during the interview. His statement regarding his culpability in the shooting of the victim was made after specific conversation about his facing the death penalty. Therefore, the totality of the circumstances indicates that appellant did not make his statement without being fully aware of the ramifications of the charge against him.

Appellant's eighteenth assignment of error is overruled.

Upon review of the record and the relevant law, we sustain appellant's first and tenth assignments of error. Appellant's Assignments of Error Nos. 11 and 18 are overruled. The remaining assignments of error as set forth in appellant's brief, Nos. 2, 3, 4, 5, 6, 7, 8, 9, 12, 13, 14, 15, 16 and 17, are moot, as we have reversed the judgment of the trial court sentencing appellant to death and remanded the case to the trial court for further proceedings. Therefore, we affirm that portion of the Shelby County Court of Common Pleas judgment of conviction and sentencing finding appellant guilty of R.C. 2911.01 and reverse that portion of the judgment of conviction finding appellant guilty of a violation of R.C. 2903.01 and sentencing appellant to death, and remand the cause for proceedings in accordance with this opinion.

*Judgment affirmed in part,*
*reversed in part,*
*and cause remanded.*

EVANS and THOMAS F. BRYANT, JJ., concur.