Defendant-appellant Robert R. Martin appeals from his convictions after a jury trial on five counts of aggravated robbery and five counts of kidnapping, all with firearm specifications.
Appellant contends the trial court's denial of his motions to suppress evidence, its refusal to give a requested jury instruction, and its failure to merge his convictions for purposes of sentencing constitute reversible error. Appellant further contends his convictions are neither based on sufficient evidence nor sustained by the weight of the evidence. This court has examined the record, however, and finds the trial court's actions were appropriate. Moreover, the evidence introduced at appellant's trial provided a proper basis for his convictions. Therefore, appellant's convictions are affirmed.
Appellant's convictions stem from an incident that occurred in the late afternoon of January 23, 1997. On that day, at approximately 5:10 p.m., Vershaun Jackson was working as the assistant manager of a "Long John Silver's" restaurant located at 5581 Warrensville Center Road in the City of Maple Heights, Ohio. Several other employees also were in the store at that time; they included "team leader"[1] Tammy Mason, cashiers Janis Presley and Dana Hill, and Lashelle Pope.
With Presley assisting her, Jackson was preparing an order for a customer waiting at the "drive-thru" window. Mason and Hill stood at a cash register preparing to "count the drawer down." Pope was in the process of obtaining her paycheck. The workers heard the front door "chime," indicating someone had entered the store.
Jackson looked up from her task and saw a man standing in the dining area "with a gun one" the only customer. The man, later identified as Charles Marshall,[2] was clothed in black, and a "small mask" obscured much of his face.
Reacting quickly, Jackson "stooped down" in order to press the alarm button on the security pendant she wore around her neck. A signal from the pendant immediately alerted the Maple Heights Police Department of the location of the alarm. When Jackson arose again, Marshall demanded to know "what [she] was doing." Jackson responded by putting her hands in the air and denying any activity.
Marshall ordered all the people in the restaurant to move back toward the kitchen area. When they had complied, Marshall began "frisking" them in order to assure himself they had no "cell phones," i.e., no means of communicating their situation to anyone. As Marshall did so, Jackson and the others saw another man, later identified as appellant, approaching. Appellant stopped at a distance approximately ten feet away, near the "back door area."
Appellant was dressed in a red sweatshirt and khaki pants and also was wearing a "white bandana" that obscured his nose and mouth. When Marshall asked the customer if he were a police officer, appellant and Jackson "made eye contact" for several moments. Jackson was aware that a video monitor camera next to her was recording the scene; however, appellant at that time struck the monitor, displacing it.
At that point, Marshall began "herding" the others into the store's freezer unit. Once the customer and other employees were inside, Marshall closed the door to prevent their escape. He then ordered Jackson to pass appellant and stop at the counter area where the store's safe was located. Appellant remained near the freezer. Marshall then stated to Jackson, "[Y]ou know the routine."
Jackson attempted to "buy [her]self some time" while opening the safe. When she eventually finished, Marshall "tossed" a pillowcase to her and told her to "fill it up." Jackson's subsequent actions in removing the money from the safe, however, apparently proved to be too slow, for Marshall pushed her away in order to obtain the cash himself.
Marshall's impatience enabled Jackson to look outside, where she observed a police car entering the parking lot. Jackson's attempts to attract the attention of the officer were noticed by Marshall. Marshall's suspicions were aroused, but he initially failed to observe the officer's arrival. When he had completed taking the money from the safe, however, Marshall looked out the window and discerned the police car. He thereupon pointed the gun at Jackson, threatened to kill her, then turned his eyes toward appellant. As Marshall called "5-0"[3] to appellant, Jackson took that brief opportunity to escape through the restaurant's front door.
Marshall and appellant fled through the back door. Maple Heights Officer Lanel Hunter, who had arrived only moments before, was removing his shotgun from his vehicle when he saw the restaurant's service entrance open and two men emerge. Hunter called out for them to stop.
Although the two men had begun to run, at Hunter's command to halt, the man clothed in black did not comply; rather, he turned and fired a .38 caliber revolver at Hunter. Hunter "dove for cover," then "jumped back out" to pursue the suspect. As Hunter did so, he observed the shooter seemed to be about to fire his weapon again. Hunter fired his shotgun and succeeded only in breaking the window of a nearby van. Marshall and his companion continued their flight.
As the two suspects, with Hunter in close pursuit, headed for a "tree line" behind some private property, leaped a fence and then traveled through the "backyards of Century Way," the officer saw Marshall's companion, who had "rusty brown hair" and was dressed in red and khaki," fall several times into the snow covering the ground. Hunter never lost sight of the two suspects as he pursued them.
A short distance away from the restaurant, at 20625 Century Way, eleven-year-old Brandee Weeks had been in the basement of her house that afternoon watching television with her friend Matthew Duckworth and her older brother Darnell. At approximately 5:25 p.m., Brandee's mother Vera called downstairs to her that her dinner was ready. While Vera went to the bathroom to shower, Brandee left Matthew and Darnell in the basement.
Brandee had begun eating when she saw Darnell come upstairs. Darnell went to the back door, appeared to "step outside" for a moment, then re-opened the door. Brandee heard two people "stumbling down the stairs" to the basement before Darnell reentered the house.
Matthew was still seated in front of the television. He caught a glimpse of one person who had "stumbled" down the stairs and who "looked like he had like a reddish jacket on." The man was followed by Darnell. The commotion caused Matthew to leave the basement to seek out Brandee; the two children then went to a window and "saw a lot of policemen's cars."
Several police officers by that time had responded to the report of a robbery in progress. Officer Gerald Prusha had observed Hunter in foot pursuit of the suspects, broadcast the location of the house into which the suspects had fled, and taken a position at a corner of the house while Hunter and Officer Dennis Bruening approached the back door.
Hunter and Bruening announced their presence. At their command, Darnell was the first to exit the house through the back door. Hunter immediately recognized Darnell from having spoken to him "many times on the streets." Darnell offered no resistance to the officers.
Then another man, later identified as appellant, emerged through the same door. Appellant was wearing jeans, a gray sweatshirt and untied shoes. He appeared "disoriented" and either unable or unwilling to comply with the officers' demands that he get on the ground." Eventually, Bruening approached appellant; in the ensuing struggle, appellant fell into the glass of the back door and sustained a laceration on his face.
As appellant was transported to the hospital, the remaining officers continued the search for the remaining suspect. Weeks was taken to the restaurant, where none of the employees identified him as being one of the robbers.
In the basement "bedroom area" of the Weeks home, the officers observed a wet "pile of clothing" consisting of a red sweatshirt and khaki pants. They also discovered in an open cabinet next to the bed six "live" .38 caliber bullets. The officers searched the basement of the home for approximately one and one-half hours before Bruening checked a one-foot-wide gap existing behind a shower wall. A "stack of laundry" obscured the other suspect, who was "wedged in there standing."
The suspect complied with Bruening's order to exit his hiding place but pretended to have difficulty speaking English. Although he initially stated his name was Leon Gomez, he eventually was identified as Charles Marshall. Marshall was clothed in several "layers" of clothing, the outermost of which was black in color. He carried a "neoprene mask" in his pocket and wore only one boot. The officers subsequently also discovered a pair of black gloves and a .38 caliber pistol in the laundry piled near Marshall's hiding place. Laboratory analysis later indicated the shot fired at Hunter had come from that gun.
Over $200 in currency and coin were retrieved near both the restaurant and the back door of the Weeks house. Furthermore, some days after Prusha had transported Marshall to the police station, Prusha made another discovery in his zone car. Under the passenger seat in front of the area in which Marshall had been seated were some documents bearing his name and "two [Uncle Mike brand] speed loaders for a .38 Special, each loaded with six live rounds of .38 special ammunition."
Following the report of the robbery, at approximately 5:30 p.m., Maple Heights Police Detective Ronald Arko responded to the restaurant. Inside, he met Jackson, who pointed to a black canvas "Uncle Mike" brand gun holster lying on the floor. Arko placed it into evidence along with the "cash drawer" from the restaurant's safe; Jackson estimated the robbers had taken approximately $240 in cash from the drawer. Soon thereafter, Jackson identified some of the clothing Marshall had been wearing when he was found. She also identified Marshall's face from a photograph.
Later that evening, Jackson reviewed the video of the robbery with a district supervisor. Appellant could be seen entering the store after Marshall and placing the bandana over his lower face. The video was subsequently delivered to the police department. Jackson's review of this latest video, moreover, reminded her that she had seen appellant in the restaurant in Marshall's company on November 29, 1996. Jackson particularly remembered Marshall as she had seen him robbing the restaurant on October 22, 1996. The video recording of appellant's and Marshall's November 29, 1996 visit to the restaurant also was given to the police.
Approximately one and one-half hours after the robbery, appellant was released from the hospital and transported to the police station. Appellant was "booked" and photographed, then Arko placed appellant in an interview room. Arko informed appellant he wished to obtain information about the robbery and also about the other suspect, who at that time was known only as "Leon Gomez." Arko then gave appellant a "standard rights form." Appellant reviewed the form and then signed it, indicating he wished to make a written statement. Arko then left the room.
Approximately one half-hour later, Arko returned and obtained the statement appellant had written. Appellant denied any involvement in the crime. He indicated he had been sleeping on the basement couch in the Weeks home after having "a little to drink and lot to smoke" when he was awakened by a policeman's shout that he come upstairs. He stated that although he complied, he was "pushed through a glass window." Appellant further noted he was watching "Channel 28" and wearing "a gray sweatshirt and blue jeans and sneakers" when this occurred.
The following morning, however, appellant asked to speak to Arko. At that time, appellant told Arko that he had "lied" in the first statement. Appellant stated that just prior to the police arrival at the Weeks house, a man named "Alex," whom he knew only as a friend of Marshall's, had run inside. Appellant indicated Marshall could provide further information as to Alex's identity; however, Arko was unable to corroborate appellant's new information.
On January 28, 1997, Arko presented Jackson with two separate photographic arrays. Arko covered the nose and mouth areas of each person in the array. From the first array, Jackson chose appellant's photograph as "the robber without the gun." From the second array, Jackson chose Marshall's photograph as the person who had held the gun during the robbery.
Appellant subsequently was indicted with respect to the January 23, 1997 incident with Charles Marshall on five counts of aggravated robbery, R.C. 2911.01, five counts of kidnapping, R.C.2905.01,[4] and one count of felonious assault, R.C. 2903.11. Each count contained two firearm specifications for the possession and the use of a firearm during the commission of the offense; the final count also contained a peace officer specification.[5] Appellant entered pleas of not guilty to the charges and retained counsel to represent him.
Prior to his trial, appellant filed motions to suppress the evidence of both Jackson's identification of him and his January 23, 1997 written statement. The trial court held a hearing on appellant's motions; thereafter, in a written opinion and order, the trial court denied both motions.
Appellant and his co-defendant received separate trials; appellant's trial commenced on June 30, 1997. In addition to numerous exhibits, the state presented the testimony of several witnesses. Jackson and three other victims of the robbery testified, as did Officer Hunter, Detective Arko, a few other police officers involved in the investigation of the crime, Matthew Duckworth, and the three members of the Weeks family. Following the trial court's denial of his motions for acquittal, appellant declined to present any evidence.
The jury ultimately found appellant guilty of the first ten counts of the indictment and guilty of the specifications. The jury found appellant not guilty of felonious assault upon Police Officer Hunter.
The trial court ordered a presentence investigation and report before sentencing appellant to terms of incarceration as follows: eight years on counts one through four to run concurrently with nine years on count five; seven years on counts six through nine to run concurrently with nine years on count ten; and counts five and ten to run consecutively to each other and to four years on the firearm specifications.
Appellant has filed a timely appeal of his convictions. He presents six assignments of error for review, which will be addressed in logical order rather than seriatim.
ASSIGNMENT OF ERROR NO. I
 THE TRIAL COURT'S FAILURE TO SUPPRESS THE APPELLANT'S STATEMENTS SHORTLY AFTER HIS ARREST PREJUDICED THE APPELLANT AND VIOLATED THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION.
Appellant argues the trial court erred in failing to suppress the evidence of his written and oral statements made on January 23 and 24, 1997, asserting these statements were involuntarily made. Appellant presents no citation to authority in support of his argument as required by App.R. 16 (A) (7). Moreover, his argument is unpersuasive.
 A statement is deemed voluntary if a reviewing court, examining the totality of the circumstances under which it is made, determines that the statement was not the result of official coercion or improper inducement.
State v. Brock (1996), 110 Ohio App.3d 656, 675. See, also, Statev. Tucker (1998), 81 Ohio St.3d 431.
In the present case, the trial court thoroughly reviewed in its written opinion and order the testimony of Detective Arko in conjunction with the videotape of his interview of appellant shortly after appellant's arrest. Only then did it conclude that appellant was neither mentally incapacitated at the time nor subjected to any coercion. The trial court's conclusion is supported by the record. State v. Spinks (1992), 79 Ohio App.3d 720.
By the time of the interview on the evening of January 23, 1997, appellant had been in police custody for several hours. He had been released from the hospital after being treated for only a facial laceration. Furthermore, appellant's discussion with Arko and his subsequent written statement demonstrate his complete coherence of thought and his ability to logically express those thoughts. See, e.g., State v. Knotts (1995),111 Ohio App.3d 753; State v. Mulkey (1994), 98 Ohio App.3d 773. Finally, the promise of an inquiry as to appellant's possible release on "bond" in exchange for appellant's cooperation merely in helping to identify Marshall's real name does not constitute "coercion." State v. Burke (1995), 73 Ohio St.3d 53 [73 Ohio St.3d 399];State v. Brock, supra; cf., State v. Arrington (1984).14 Ohio App.3d 111.
Since the totality of the circumstances supports the trial court's finding appellant's statements were voluntarily made, appellant's first assignment of error is overruled.
ASSIGNMENT OF ERROR NO. II
 THE TRIAL COURT IMPROPERLY DENIED THE MOTION TO SUPPRESS THE IDENTIFICATION PROCEDURES USED IN THE PHOTO ARRAY IN WHICH MS. JACKSON MADE HER IDENTIFICATION OF THE APPELLANT IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION.
Appellant argues the photographic array displayed to Jackson was unduly suggestive and, therefore, her identification of him from it as one of the robbers was improperly admitted into evidence. This argument is unsupported by the record.
Although appellant asserts the photographic array was unnecessarily suggestive of his guilt, a perusal of the array reveals it contains photographs of black males of similar age, build and hairstyle. Appellant's characteristics do not stand out, and his clothing is neither highly visible nor so indicative of guilt as to taint the array. State v. Butler (1994),97 Ohio App.3d 322; State v. Conroy (Sep. 24, 1998), Cuyahoga App. No. 72987, unreported.
Moreover, no due process of law violation occurs where an identification is the result of observations made at the time of the crime rather than one which stems from an impermissibly suggestive confrontation. State v. Davis (1996), 76 Ohio St.3d 107,112; see, also, State v. Hill (1987), 37 Ohio App.3d 10.
Therefore, even if this court were to accept appellant's argument that the photographic array was suggestive, appellant cannot demonstrate under a totality of the circumstances that Jackson's identification was unreliable. State v. Waddy (1992),63 Ohio St.3d 424 at 438.
Jackson, whom the testimony established was normally a careful person, previously had been the victim of a robbery and, as a result, was in a heightened state of scrutiny. She not only observed appellant for a period of time in a well-lit room, she made significant "eye contact" with him during that time. Her description of him was accurate, and she immediately selected appellant's photograph from the array only days after the incident. State v. Davis, supra; State v. Butler, supra; State v.Halley (1994), 93 Ohio App.3d 71; State v. Green (1990),67 Ohio App.3d 72.
Since the record reveals Jackson's identification of appellant was neither the result of an impermissibly suggestive confrontation nor unreliable, the trial court did not err in denying appellant's motion to suppress the evidence.
Accordingly, appellant's second assignment of error is overruled.
ASSIGNMENT OF ERROR NO. VI
 THE TRIAL COURT DENIED THE APPELLANT A FAIR TRIAL AND ABUSED ITS DISCRETION WHEN IT FAILED TO GIVE A JURY INSTRUCTION ON EYEWITNESS IDENTIFICATION.
Appellant asserts the trial court abused its discretion when it refused appellant's request for a specific instruction based uponUnited States v. Telefaire (D.C. Cir. 1972), 469 F.2d 552
concerning eyewitness identification. Instead, the trial court relied upon standard Ohio jury instructions. A review of the record supports the trial court's decision.
The Ohio Supreme Court discussed Telefaire in State v. Guster
(1981), 66 Ohio St.2d 266, and its syllabus stated the following:
 A trial court is not required in all criminal cases to give a jury instruction on eyewitness identification where the identification of the defendant is the crucial issue in the case and is uncorroborated by other evidence. A trial court does not abuse its discretion in deciding that the factual issues do not require, and will not be assisted by, the requested instructions, and that the issue of determining identity beyond a reasonable doubt is adequately covered by other instructions.
(Emphasis added.)
Especially in a case where both the eyewitness identification is reliable and there is no need of such further specific instruction, the trial court is within its discretion to refuse such a request by the defendant. State v. Coffman (1984),16 Ohio App.3d 200; State v. Wells (Feb. 4, 1994), Cuyahoga App. No. 64575, unreported.
As previously discussed, Jackson's identification of appellant as one of the perpetrators of the robbery was reliable. State v.Guster, supra. Moreover, her testimony was corroborated both by Hunter's description of the gunman's accomplice and by physical evidence, viz., the wet clothing found in the Weeks' basement, the place in which appellant admitted he was present prior to his arrest. State v. Perkins (Nov. 2, 1995), Cuyahoga App. No. 68580, unreported.
Thus, since the facts of this case fail to demonstrate the trial court abused its discretion in denying appellant's request for a Telefaire instruction, appellant's sixth assignment of error also is overruled.
Appellant's third and fourth assignments of error state:
ASSIGNMENT OF ERROR NO. III
 THE EVIDENCE IS INSUFFICIENT TO SUSTAIN THE APPELLANT'S CONVICTIONS FOR THE UNDERLYING CRIMES AND THE FIREARM SPECIFICATIONS.
 ASSIGNMENT OF ERROR NO. IV
 THE VERDICTS ARE AGAINST THE WEIGHT OF THE EVIDENCE.
Appellant argues his convictions are neither sustained by the evidence nor in accord with the weight of the evidence. This court does not agree.
In State v. Thompkins (1997), 78 Ohio St.3d 380 at 386-87, the court distinguished these two legal concepts as follows:
 With respect to sufficiency of the evidence, "`sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29 (A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction) In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's, supra,
at 1594.
Appellant's convictions in this case comport with both legal standards as set forth above.
Brandee Weeks testified she observed appellant in the company of Charles Marshall shortly before the time the incident occurred; the two were walking in the direction of the restaurant. Jackson positively identified appellant as one of the robbers, believed appellant was guarding the freezer to "make sure no one came out" while she and Marshall went to the safe, and heard Marshall warn appellant of the police arrival at the scene.
Similarly, when asked if, as the robbery progressed, Mason received the impression the two men were working together, she answered, "Yes," basing her impression upon the fact that Marshall did not display his firearm until the other masked man came into sight. Mason's testimony on this issue was supported by both Hill and Hunter. Hill answered, "Yes," when asked if, in her opinion, the two men were working together. Hunter stated the two men fled together after Marshall fired the weapon at him; the suspects traveled in the same direction and ran into the same house. The wet clothing subsequently found in the basement from which appellant admitted he emerged matched the description of the clothing appellant had been wearing during the robbery. Hunter further testified it was common for young men in that area to be dressed in "layers" of clothing.
From the foregoing, it is clear appellant's convictions for aggravated robbery and kidnapping with firearm specifications were supported by sufficient evidence. State v. Perkins, supra;State v. Burford (Dec. 9, 1993), Cuyahoga App. No. 64432, unreported.
Similarly, appellant's convictions are sustained by the weight of the evidence. The testimony of the state's witnesses and the evidence presented by the state created a solid depiction of both the incident and appellant's role as one of the perpetrators of the offenses. This depiction was assembled in a persuasive manner.
Appellant's statements to the police, on the other hand, only reinforced the evidence of his guilt. Although appellant admitted his presence in the Weeks home when the police arrived, his assertion that he was sleeping there during the incident was directly contradicted by the testimony of four witnesses.
Thus, appellant's convictions were not against the manifest weight of the evidence. State v. Toles (Sep. 11, 1997), Cuyahoga App. No. 70130, unreported; State v. Rawls (Apr. 30, 1998), Cuyahoga App. No. 72051, unreported.
For the foregoing reasons, appellant's third and fourth assignments of error also are overruled.
ASSIGNMENT OF ERROR NO. V
 THE TRIAL COURT FAILED TO MERGE THE APPELLANT'S CONVICTIONS AT THE TIME OF SENTENCING TO THE PREJUDICE OF THE APPELLANT.
Appellant argues his convictions and sentences for both aggravated robbery and kidnapping charges were improper because they were allied offenses of similar import.
Pursuant to R.C. 2941.25 (B), a trial court is authorized to convict and sentence a defendant for two or more offenses that have as their origin the same criminal conduct if the offenses (1) were not allied and of a similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. State v. Rance (1999), 85 Ohio St.3d 632; State v.Mughni (1987), 33 Ohio St.3d 65.
In State v. Logan (1979), 60 Ohio St.2d 126, the court established the following guidelines to determine whether kidnapping and another crime are committed with a separate animus as to each under R.C. 2941.25 (B):
 (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the underlying restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
 (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.
Id., at syllabus (emphasis added); see, also, State v. Tinch
(1992). 84 Ohio App.3d 111.
In this case, appellant and his co-defendant initially restrained their victims to search them in order to prevent any outside communication. Then, most of the victims were moved into the freezer to prevent their escape. Only after the victims thus further were incapacitated did Marshall force Jackson to open the safe.
Moreover, prior to her escape, Marshall threatened to kill Jackson, had the capacity to do so, and might have done so if Jackson had not taken advantage of his brief warning directed to appellant. Jackson stated she was in fear of her life throughout the episode. She also stated the other victims remained in the freezer for up fifteen minutes until she reassured them it was safe to emerge.
Thus, the restraint of the victims was substantial and prolonged, led to an increased risk of injury and was more than incidental to the aggravated robbery. The trial court did not err, therefore, in sentencing appellant. State v. Tinch, supra;State v. Luff (1993), 85 Ohio App.3d 785.
Appellant's convictions and sentences are affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, J. and ANNE L. KILBANE, J. CONCUR.
 _________________________________ KENNETH A. ROCCO, PRESIDING JUDGE
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] The transcript of appellant's trial consistently indicates Marshall's name as spelled "Marshall." The indictment, however, states appellant's co-defendant's name as "Marshall." For purposes of this Opinion, appellant's co-defendant will be referred to as "Marshall."
[3] Jackson testified that in "street language," "5-0" means "the police."
[4] Each count of these two separate offenses referred, respectively, to Tamara Mason, Dana Hill, Lashalle Pope, Janis Presley and Vershaun Jackson.
[5] Additional charges against appellant based upon the October 22, 1996 robbery of the restaurant were dismissed by the state prior to trial.