OPINION
This appeal arises from a judgment of the Court of Common Pleas of Marion County, entered pursuant to a jury verdict finding Ira N. Chaiffetz guilty of Conspiracy to Commit Murder, a felony of the first degree, in violation of R.C. 2923.01(A). Chaiffetz was sentenced to nine years in prison and fined $20,000 for the offense. For the reasons expressed in the following opinion, we affirm the conviction and sentence.
The legal case against Ira Chaiffetz began on May 15, 1997, when a grand jury returned a single count indictment, alleging that from September 1, 1996 through May 13, 1997, Chaiffetz, with purpose to commit or facilitate a murder, did plan or aid in the commission of a murder with another person, that one or more of them would engage in conduct facilitating the commission of the murder. Chaiffetz allegedly had conspired to murder his ex-wife, Bronwen Bello.
The events leading up to the indictment began months earlier, at the North Central Correctional Institution ("N.C.C.I."), a prison in Marion County, Ohio. In October 1995, Chaiffetz took a job as a physician at N.C.C.I. In this capacity, he became acquainted with an inmate named Victor Gatto, who was serving a sentence for forgery and drug trafficking offenses. Gatto suffered a heart condition that required regular medical attention; consequently, Gatto and Chaiffetz spent a great deal of time together throughout 1996. Ultimately, the two became very familiar with each other's personal lives.
It was no secret among Chaiffetz's co-workers and his inmate patients that the doctor had been involved in an ongoing custody battle with his ex-wife, Bronwen Bello. Chaiffetz and Bello had been married in 1983 and had two children, David and Sarah, before they divorced in 1987. Custody of the children was frequently in dispute.
By 1996, Bronwen was remarried, to a man named John Bello. The Bellos maintained custody of Sarah in Florida. Meanwhile, Chaiffetz had custody of David in Ohio. In the spring of 1996, the latest in a line of custody battles erupted. As the intensity of this dispute increased, so too it seems, did Chaiffetz's animosity toward Bello. In August of that year, a Florida domestic relations court awarded custody of both children to Bello.
Following the devastating loss of his children to a woman he publicly referred to as "Godzilla," Chaiffetz made an agreement with Gatto to pay $12,000 to hire hitmen to kill Bello. From stories Gatto told, Chaiffetz believed Gatto had Mafia connections and would be able to arrange this assassination. Chaiffetz and Gatto agreed that Chaiffetz would pay $4,000 up front, with the remainder due when Bello was dead.
According to the plan, Chaiffetz would make three separate payments totaling $4,000, to Mary McCauley, Gatto's Las Vegas girlfriend. The evidence at trial confirmed that on September 23, 1996, Chaiffetz clocked out of work at 3:40 p.m., drove to a Huntington National Bank branch in Marion, Ohio, and withdrew $2,200 from his account. By 4:25 p.m., Chaiffetz purchased a cashier's check for $2,000 from a Huntington National Bank branch in Delaware, Ohio. Chaiffetz used cash to purchase the check, making it payable to Mary McCauley, and gave the name "John Smith" as purchaser. On October 12, 1996, and again on November 20, 1996, bank surveillance cameras recorded Chaiffetz purchasing $1,000 cashier's checks from State Savings Bank in Columbus, Ohio. Bank tellers confirmed that Chaiffetz used cash for these transactions, that the checks were made out to Mary McCauley, and that he gave the name "James McCauley" as purchaser.
It was Gatto's testimony at trial that although he took this money from Chaiffetz (via McCauley) he never intended to carry out any plans to execute Bronwen Bello. Indeed, Gatto apparently instructed McCauley to use the money Chaiffetz sent to place bets on his behalf. Taped conversations between Gatto and McCauley supported the fact McCauley was upset with Gatto for gambling this money away. It seemed that McCauley had hoped to use the money toward a future real estate purchase and did not want to alienate Chaiffetz from future participation in a real estate venture by squandering his money. Nevertheless, the evidence at trial also confirmed that McCauley used $500 of the money to purchase a secured credit card for herself.
Although there was some evidence that McCauley had hoped to use the money she had received for a future real estate purchase, it was McCauley's contention at trial that she did not know exactly why she was receiving the cashier's checks through the mail. She was aware that they had come from Chaiffetz (the two had some brief telephone conversations on the matter) as a result of his relationship with Gatto. She assumed that it had something to do with drugs since Gatto had a long history in the drug trafficking trade and McCauley recalled Gatto stating that Chaiffetz was interested in hearing about the business. It was not until about December 4, 1996 that she learned the purpose behind the checks. Gatto informed her in a letter "that the doctor wanted his wife whacked."
According to Gatto, after Chaiffetz sent payments totaling $4,000 to McCauley, Chaiffetz began to question Gatto about when the hitmen would complete their job. In order to stall Chaiffetz, Gatto made up a story that the hitmen had been arrested and detained in Florida and that he would have to arrange for different hitmen to kill Bello. In February 1997, unable to further stall Chaiffetz, and believing that "one way or another" the doctor would see that the execution took place, Gatto wrote a letter to the Attorney General of Ohio, Betty Montgomery, informing her of the violence he feared would take place.
As a result of Gatto's letter, Trooper Kevin Smith from the Ohio State Highway Patrol was assigned to investigate Gatto's allegations. Gatto subsequently agreed to assist police in apprehending Chaiffetz in exchange for the State's promise of assistance in his upcoming parole hearing. To further the investigation, Gatto wore a recording device in April and May 1997, during three of his medical appointments. In the conversations recorded, Chaiffetz and Gatto discussed how Bello could be killed in a drive-by shooting; that "eight grand" was due when the execution was complete; that the hitmen would make Bello disappear the way Chaiffetz wanted and that, if he got in the way, the hitmen would take out John Bello as well. Moreover, the two men discussed how this wasn't the first time someone had tried to kill "the broad"; that she would "be killed before the week's up;" it would happen right away; and that Chaiffetz was afraid he would have the "heat" on him.
According to Trooper Smith's instructions, Gatto told Chaiffetz to send the "hitmen" photographs of Bello. Gatto gave Chaiffetz the address of a specific Cleveland, Ohio, post office box that was then monitored by police. An envelope addressed to "James McCauley" containing pictures of Bronwen Bello was sent through the Columbus, Ohio Post Office, with a postmark dated April 11, 1997. The postal inspector in Cleveland recovered the envelope on April 14, 1997 and turned it over to Trooper Smith. No fingerprints were recovered from the envelope or photos; however, a handwriting analysis of the address written on the envelope claimed "similarities" to Chaiffetz's known handwriting.
Also at the trooper's direction, Gatto requested Chaiffetz make an additional payment to McCauley. Gatto suggested to a reluctant Chaiffetz that he should pay $2,000 more, half the contract price, before the hitmen would be sent to kill Bello. Following this discussion, a bank teller and surveillance photographs from State Savings Bank in Columbus, Ohio, confirmed that Chaiffetz purchased another $1,000 cashier's check, made it payable to Mary McCauley, and gave a purchaser name of "James McCauley." On May 8, 1997, McCauley received the check along with a note, which read: "rest very soon." Police recovered this check and note from McCauley. Handwriting analysis on the envelope again identified Chaiffetz as the author, however, since the note was written in block letters, the handwriting analyst could not identify Chaiffetz as the author of the note. Four days later, during a taped conversation between Gatto and Chaiffetz, Gatto informed Chaiffetz that Mary McCauley had received "that thing yesterday," that he "called and told them [hitmen] go ahead," and that Bello would "be killed before the week's up."
On May 14, 1997, Trooper Smith interviewed Chaiffetz regarding his relationship with Gatto, wherein he denied the preceding events. Specifically, he denied hiring Gatto to kill his ex-wife, sending any money to Mary McCauley in Las Vegas, talking with Mary McCauley on the phone, possessing any photographs of his ex-wife, and sending any photographs of her to a Cleveland post office box.
At trial, Chaiffetz admitted that he lied to the trooper about a number of things during the May 14th interview out of fear that he would lose his job at N.C.C.I. if it were known that he had a relationship with an inmate. Chaiffetz did concede that he sent money to McCauley, but he claimed the payments were for real estate purposes.
There was evidence at trial that in the fall of 1996, Gatto and McCauley had talked about purchasing some Las Vegas real estate with Chaiffetz. McCauley agreed to investigate real estate properties and to send Gatto information on the properties so he could review them as potential investment opportunities with Chaiffetz. Thus, Chaiffetz contended at trial that the money he sent to McCauley was to show that he was serious about investing and also for use as a deposit on property. However, there was no evidence at trial that McCauley's real estate inquiries in Las Vegas ever culminated in serious plans to purchase any particular piece of real estate. In fact, Chaiffetz admitted that he had no documentation relating to any real estate transaction, that Gatto and McCauley had no expertise in real estate, that he had never visited nor did he ever intend to live in Las Vegas, and that he really did not trust Gatto, given his criminal history and Mafia connections.
Chaiffetz also denied sending photographs of Bronwen Bello to Cleveland and implied that Gatto must have stolen some old photos of Bello from his desk at N.C.C.I. and mailed them to Cleveland himself. Furthermore, Chaiffetz claimed that he sent McCauley the $1,000 payment in May of 1997 in an attempt to stop any plot to assassinate Bello. According to Chaiffetz, Gatto, apparently out of a sense of loyalty or friendship, had repeatedly brought up the idea of using his "connections" to kill Bello, given the grief she had caused in Chaiffetz's life. Although Chaiffetz claimed he had always refused such an idea, thinking Gatto was not serious, Gatto had become so insistent in regard to the idea, that Chaiffetz feared he would actually send hitmen out to kill Bello unless Chaiffetz pacified Gatto with money. There was no evidence at trial that Chaiffetz ever contacted authorities regarding this perceived threat or otherwise attempted to warn Bello of impending danger.
After hearing this evidence over the course of a two week trial, the jury found Appellant guilty of Conspiracy to Commit Murder, a first degree felony.
Appellant now appeals his conviction and sentence, presenting fifteen assignments of error for our review. For better continuity in this opinion, we will address the assignments out of their original sequence.
Assignment of Error Number Twelve
 The jury was selected in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and in violation of Batson v. Kentucky (1986), 476 U.S. 79 and J.E.B. v. Alabama (1994), 511 U.S. 127.
In Batson v. Kentucky (1986), 476 U.S. 79, 90 L.Ed.2d 69, the United States Supreme Court held that the jury selection process is subject to the confines of the Equal Protection Clause. Batson further holds that a prosecutor is entitled to exercise peremptory challenges " 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried" and as long as the challenge is not based solely on account of a potential juror's race. Id. at 89, 90 L.Ed.2d at 82-83, quoting United States v. Robinson (D.Conn. 1976), 421 F. Supp. 467,473.
To establish a prima facie case of purposeful discrimination, a defendant must establish: (a) that members of a recognized racial group were peremptorily challenged; and (b) that the facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race. State v. Hill (1995), 73 Ohio St.3d 433,444-445; State v. Hernandez (1992), 63 Ohio St.3d 577, 582; Batson, supra. Once the defendant has established a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Id. Then the trial court must determine whether the defendant has carried his burden of establishing purposeful discrimination.
In the instant case, the State exercised its last preemptory challenge on a black woman. Appellant objected, arguing the State had excused the only black woman on the panel. The State claimed that the woman was an experienced juror from California; and thus, the State said it feared she would carry over her knowledge of that state's criminal law and jury practice to influence the jury in the present case. The trial court accepted this explanation as a race-neutral explanation for striking the juror.
In J.E.B. v. Alabama ex rel. T.B. (1994), 511 U.S. 127, the United States Supreme Court extended its holding in Batson to forbid the use of peremptory challenges by the state to exclude potential jurors on the basis of gender. The court indicated that for a trial court to make a determination of whether or not the state's exercise of peremptory challenges to strike venire members on the basis of gender violates the Fourteenth Amendment to the United States Constitution, the Batson test is employed. Id. at 144-145; State v. Brock (1996), 110 Ohio App.3d 656, 670.
In this case, the State also exercised two of its four peremptory challenges on men. Appellant objected after the State removed the second venireman, arguing the State was trying to keep males off the jury. The State articulated a gender-neutral explanation for striking the man, noting that the man had what the prosecution labeled a "red" personality. This was a psychological classification that the State explained indicated an individual who is "quick to decide", would "tend to be tough to move" and "have a high tendency to hang up juries." The trial court allowed the peremptory challenge to stand.
Whether a party intends to racially discriminate in challenging potential jurors is a question of fact. We will not reverse a decision of the trial court unless convinced that its determination is clearly erroneous. Hernandez v. New York (1991),500 U.S. 352, 369; Hernandez, 63 Ohio St.3d at 583. "Trial judges, in supervising voir dire, are best equipped to resolve discrimination claims in jury selection, because those issues turn largely on evaluations of credibility." Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 102, citing Batson at 98. Even assuming, arguendo, that Appellant satisfied his prima facie burden, the race and gender-neutral explanations for excusing the jurors at issue adequately demonstrated no purposeful discrimination by the State. We find no inferences from the record that the prosecutor used the preemptory challenges as a tactic to exclude the venire members from the jury on account of their race or gender. Hence, we defer to the implicit findings of the trial court that Appellant failed to demonstrate purposeful discrimination by the State in the manner it used its preemptory challenges. See Hernandez, 500 U.S. at 369. Appellant's twelfth assignment of error is overruled.
Assignment of Error Number Two
 The trial court erred in granting the State's Motion in Limine regarding Gatto's prior undercover work with law enforcement. This evidence was highly relevant and its exclusion denied Appellant his right of confrontation and due process under the United States and Ohio Constitutions.
Assignment of Error Number Three
 Appellant's confrontation and due process rights under the U.S. and Ohio Constitutions were violated as a result of the trial court's ruling that Appellant could not cross-examine concerning a Justice Department letter warning federal agencies that Gatto should never be used again as a government informant.
Assignment of Error Number Four
 Appellant was denied his right of due process and confrontation under the U.S. and Ohio Constitutions when it ruled that prior convictions of Gatto over ten years old were inadmissible. The court used an erroneous legal standard in reaching its decision.
In these three assignments of error, Appellant alleges confrontation and due process violations relating to various decisions of the trial court restricting the scope of Appellant's cross-examination of the State's star witness, Victor Gatto. Given the related subject matter of these assignments, we will address them together.
Prior to trial, the State filed two motions in limine, one asking the court to prevent Appellant from presenting evidence of Gatto's prior criminal convictions more than ten years old, and another asking the court to prevent Appellant from presenting evidence of Gatto's prior work as a government informant. In response to the motion in limine regarding Gatto's prior convictions, Appellant argued that the prior convictions over ten years old should be admissible because their probative value outweighed their prejudicial effect and because, under Evid.R. 616, the convictions were offered as evidence of bias or interest in the litigation.
There is no disputing that Victor Gatto had a long history of illegal activity, starting as far back as 1962. In an in camera interview, Gatto described a myriad of criminal convictions, including multiple forgeries, uttering, drug charges, felony assault charges, passing bad checks, grand theft, and repeated probation and parole violations, all occurring prior to 1986, the ten year limit of admissibility under Evid.R. 609(B). Gatto further testified that he had been involved in organized crime since he was seventeen years old.
It was Appellant's contention at trial that these convictions should have been admitted pursuant to Evid.R. 609. We disagree. Evid.R. 609(A) generally provides for impeachment of a witness by evidence of the conviction of prior felonies or other crimes involving dishonesty or false statement. Evid.R. 609(B) imposes a time limit on the use of such information:
 Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement, or the termination of probation, or shock probation, or parole or shock parole imposed for that conviction, whichever is the later date * * *.
Evid.R. 609(B) also provides an exception to the time limit restriction in cases where "the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Consequently, a trial court possesses broad discretion under Evid.R. 609 to determine the extent to which testimony will be admitted. State v. Wright (1990), 48 Ohio St.3d 5,7; State v. Amburgey (1987), 33 Ohio St.3d 115.
In this case, Appellant cross-examined Gatto regarding 11 prior felony convictions occurring within the ten year timeframe imposed by Evid.R. 609(B), including receiving stolen property, two grand theft convictions, three forgery convictions, three uttering forged documents convictions, aggravated trafficking, and possession of criminal tools. In addition to these crimes, Gatto gratuitously admitted to the jury that he has been involved in the cocaine business for 40 years.
Appellant did cross-examine Gatto at great length regarding his multiple probation and bond violations. In an effort to fully expose his dishonest character to the jury, counsel for Appellant emphasized on cross-examination that Gatto had been entrusted to follow conditions of probation or bond and subsequently violated these trusts and conditions. The jury also heard evidence that Gatto was at one point, a fugitive from justice.
We find that given the number of convictions within the ten year time frame which were presented to the jury to impeach Gatto, including multiple forgery and uttering offenses, Appellant has not demonstrated that additional convictions of a similar nature would be anything other than cumulative evidence. Consequently, we cannot find that the trial court abused its discretion in this matter.
In an alternative argument, Appellant contends that the older convictions for forgery and uttering should have been admitted because they go to a contested issue at trial: who sent the letter containing pictures of Bronwen Bello to the Cleveland post office box? Appellant tried to argue at trial that given Gatto's long history of forgery experience, he could have disguised his own handwriting and sent the envelope and pictures to Cleveland himself in order to set up Appellant. According to Appellant, Gatto knew the only way to get an early parole was to get state assistance, and the only way to get state assistance was to frame someone for a crime and then act as an informant against him for the state. Thus, pursuant to Evid.R. 616(A), Appellant claims that the old forgery convictions were evidence of Gatto's motive to misrepresent the truth at trial.
Appellant's theory is tenuous at best. He presented no evidence at trial to link Gatto's handwriting with the handwriting on the envelope sent to Cleveland. The handwriting expert that did testify stated that the writing on the envelope bore "similarities" to Appellant's known handwriting. Moreover, although Appellant tried to argue that Gatto's history of forgery experience made him more likely or better able to falsify handwriting than any other person, the logic of this argument is suspect. As the trial court wryly noted, had Gatto been truly skilled in forgery, he would not have been caught and convicted of a slew of forgery offenses. In any case, Appellant was able to make these arguments to the jury in relation to the convictions that were admitted without objection by the State. We do not find forgery convictions that are older than ten years are any more probative of Appellant's theory of the case or any more indicative of Gatto's motive to misrepresent the truth, under Evid.R. 616(A).
Also revealed during the in camera interview was the fact that from 1976-1982, Gatto had worked as a paid informant for the federal government in its organized crime investigations, meeting regularly with federal agents. Although his work as a paid federal government informant apparently ended in 1982, Gatto again aided federal law enforcement in 1985, assisting them in the cocaine drug bust of his Cleveland attorney. In exchange for his cooperation in that case, Gatto was told that the government would not pursue drug charges against him. Although Gatto's criminal activities continued, this was the last time he worked with law enforcement as an informant prior to the instant case.
As previously mentioned, the State filed a motion in limine to prevent Appellant from presenting this evidence. Appellant argues on appeal, as he did in response to the State's second motion in limine and at trial, that Gatto's long history of informant work in exchange for obtaining benefits from the government such as money and promises of no prosecution, was relevant to demonstrate his bias in Appellant's case. Although the jury was informed that Gatto expected leniency as a result of his work in Appellant's case, Appellant claims the jury should have heard about "how adept and experienced Gatto was in his work" as an informant.
The State contends that the jury was well aware of Gatto's interest in the instant case. There was ample testimony and evidence presented at trial about Gatto's desire to be released from prison. It was undisputed that Gatto was coming up for parole and that he was promised the State's help in attaining parole in exchange for his cooperation in Appellant's case. Letters to the attorney general, written by Gatto, indicated the State had promised him assistance in his case and established his belief that he would be getting favorable treatment in exchange for his information. The State contends that any additional information about Gatto's work as an informant ten to twenty years ago, in other unrelated cases, does not go to his bias in this case. We agree.
The fact that Gatto had in the past worked for law enforcement as an informant in order to obtain benefits for himself (benefits which incidentally did not include leniency in sentencing or parole matters), is not relevant to the issue of his bias in the instant case. The evidence that was relevant to Gatto's bias in this case was his demonstrated desire to be paroled and to get state assistance in obtaining parole. This bias was fully revealed to the jury.
Even assuming, arguendo, that this prior experience was relevant, the information should have been properly excluded under Evid.R 403(A) and (B) since the probative value of evidence was outweighed by the danger of confusion of the issues, or needless presentation of cumulative evidence.
The admission or exclusion of evidence rests within the sound discretion of the trial court and, absent an abuse of discretion, a trial court's decision on the matter will not be disturbed. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus; State v. Hymore (1967), 9 Ohio St.2d 122, 128. We find no abuse of discretion in the trial court's decision to exclude evidence of Gatto's history as a government informant.
Finally, Appellant complains that he should have been allowed to cross-examine Gatto before the jury regarding a United States Department of Justice letter. This letter, which was not in the State's or Appellant's possession and does not appear in the record of this case, was apparently generated by the Justice Department in the mid-1980's and purportedly instructed other federal agencies to stop using Gatto as an informant. Appellant argues on appeal that this letter cast a shadow on Gatto's credibility as an informant. Moreover, Appellant claims the fact that the Ohio State Highway Patrol ("OSHP") did not check into Gatto's background before using him as an informant, jeopardized the integrity of its investigation.
The record reveals that it was during Gatto's in camera interview that the existence of the Justice Department letter was made known to the court. Gatto offered the following testimony in reference to the letter:
 [Gatto]: * * * Sometime around the time when this case with Soucek [Gatto's Cleveland attorney] came up, a letter came from the Justice Department forbidding anybody to work with me. And that's on file. So you can find that.
* * *
 [Defense Counsel]: So in 1984, you're indicating that a record went out directing — —
[Gatto]: Direct from Justice.
 [Defense Counsel]: From Justice, and to whom did that go?
[Gatto]: It went to all agencies.
[Defense Counsel]: And did you see a copy of that?
[Gatto]: Yeah, I signed it.
[Defense Counsel]: Okay. Justice asked you to sign it?
[Gatto]: Their attorney asked me to sign it.
[Defense Counsel]: Okay.
[Gatto]: Because I was gonna sue an agent.
 [Defense Counsel]: Okay. And what were you going to sue an agent for?
[Gatto]: Because he tried to kill me and my friend.
* * *
 [Defense Counsel]: So you signed a letter? The attorneys for the Justice Department asked you to sign it?
[Gatto]: Yeah.
[Defense Counsel]: And --
 [Gatto]: They asked me to sign it so I don't prosecute the man.
 [Defense Counsel]: So did you release them from prosecuting [sic]?
 [Gatto]: Yes. And we released each other from all obligations.
(Tr. 590-592).
Gatto went on to explain that a federal agent was purportedly paid by the Mafia to kill him. Thus, although there are no details about the "release" obtained by Gatto, it is clear that the Justice Department letter was in essence a settlement or "no prosecution" agreement. There was no indication in the record, as Appellant contends, that the letter from the Justice Department was prompted by some "fact" that Gatto was an untrustworthy informant. Thus, even if the State had some burden to know their informant's history as an informant, a burden we do not recognize here, the integrity of the State's investigation could not have been jeopardized by its failure to find out about the history of this particular letter. Moreover, Appellant has not demonstrated the relevance of this "letter" to the issues at trial. The trial court's decision not to allow Appellant to cross-examine Gatto on these matters in front of the jury was not error.
For the foregoing reasons, Appellant's second third and fourth assignments of error are overruled.
Assignment of Error Number Five
 The trial court erred by sealing documents prior to the cross-examination of Victor Gatto which were tendered to the Court by the prosecutor pursuant to Appellant's demand for discovery. Appellant was not permitted to inspect the documents. If the documents contain Brady material or inconsistencies with Gatto's trial testimony, Appellant's conviction must be reversed.
Following direct examination of Gatto on the stand, Appellant made a request, pursuant to Crim.R. 16(B)(1)(g), asking the court to perform an in camera review of Gatto's prior statements to determine the existence of inconsistencies which could then be used by defense counsel on cross-examination. The trial court reviewed the statements of the witness as reported in an OSHP police file. Finding Crim.R. 16(B)(1)(g) did not apply and, even if it did apply, finding no inconsistencies in the material, the trial court denied Appellant use of the OSHP file. The contested information has been preserved as an exhibit in the file for our review on appeal, in accordance with Crim.R. 16(B)(1)(g).
Crim.R. 16(B)(1)(g) requires a trial court to review a prior written or recorded witness statement for inconsistencies between the testimony of the witness at trial and the prior statement, after the direct examination of the witness, upon motion of the defendant. A witness "statement" includes: (a) a written statement actually signed, or otherwise adopted or approved, by a witness or party; (b) a mechanical recording of the witness's words or transcription thereof; or (c) a substantially verbatim recital of such statement in a continuous narrative form. State v. Moore (1991), 74 Ohio App.3d 334, 340; State v. Cummings (1985), 23 Ohio App.3d 40, 43; State v. Johnson (1978), 62 Ohio App.2d 31,35-36.
The court in State v. Washington (1978), 56 Ohio App.2d 129,132, determined that "[t]he word 'written' in this context does not refer to notes made by a detective talking to a witness during an investigation. The word 'written' refers to a writing made by a witness or by somebody else at the witness' direction." See, also, State v. Henry (1987), 37 Ohio App.3d 3. Generally, notes made by a police officer during an interview with a witness to a crime are not subject to an in camera inspection within the intent and meaning of Crim.R. 16(B)(1)(g). Washington,56 Ohio App.2d at 132. A police summary of a witness' oral conversation may qualify as a "statement" of the witness only if the witness has reviewed and signed, or otherwise adopted it, or if it is a nearly verbatim account as opposed to being merely the investigator's own selections, interpretations, or interpolations. Johnson, Ohio App.2d at 37; Henry, supra; Washington, supra; State v. Castillo (Dec. 31, 1987), Lucas App. No. L-86-333, unreported.
The investigative notes of Trooper Kevin Smith comprise the information contained in the OSHP file. Although statements attributed to Gatto appear in these notes, the statements are obviously not verbatim transcriptions. Nor did Gatto review, sign, or adopt the paraphrased statements as written by Trooper Smith. Thus, because the OSHP file does not contain "statements" by Gatto, Crim.R. 16(B)(1)(g) does not apply. Appellant's fifth assignment of error is overruled.
Assignment of Error Number One
 The trial court erred in denying Appellant's motion for a mistrial as a result of a prosecution witness disclosing, in the presence of the jury and in violation of an in limine order, that Victor Gatto was administered a polygraph test by the Ohio State Highway Patrol.
Initially, we note that the grant or denial of a motion for mistrial is within the sound discretion of the trial court. State v. Garner (1995), 74 Ohio St.3d 49, 59. Mistrials need only be declared when the ends of justice so require and a fair trial is no longer possible. State v. Franklin (1991), 62 Ohio St.3d 118,127. Thus, absent a showing that the accused has suffered material prejudice, an appellate court will not interfere with the exercise of that discretion. Sage, 31 Ohio St.3d at 182.
During the investigation leading up the Appellant's indictment, the OSHP requested that Gatto take a polygraph test to better evaluate his credibility as an informant. It was not disputed that the results of this polygraph were not admissible at trial, pursuant to the provisions of State v. Souel (1978),53 Ohio St.2d 123, since they were not stipulated by the parties.
Gatto's girlfriend, Mary McCauley, was apparently aware that Gatto had been subjected to polygraph testing. As the State was questioning McCauley on her conversations with Appellant during the time period of the conspiracy, she spontaneously revealed the fact of the polygraph examination to the jury.
 [Prosecutor]: Did you have further communication with the Doctor?
[McCauley]: Yes.
 [Prosecutor]: Specifically going to the middle of March of 1997, did you call Dr. Chaiffetz?
[McCauley]: Yes.
[Prosecutor]: And did you talk to him?
 [McCauley]: Yes. He left a — yeah, March. Yes, I did.
 [Prosecutor]: And in March, do you recall what you communicated to Dr. Chaiffetz?
 [McCauley]: I believe that was the call that Victor had asked me to make.
 [Prosecutor]: Do you remember where Victor was in March?
[McCauley]: Yes. He was at the Sheriff's Department.
[Prosecutor]: He had been taken out of the prison?
[McCauley]: Um-hum.
 [Prosecutor]: And did you call the Doctor and have discussion about that?
 [McCauley]: Well, not about that. Victor had thought he would be like in and out in a day or so, but they kept him several days and gave him a lie detector test.
[Defense Counsel]: Object, move for mistrial.
 The Court: Well — the jury will be instructed to disregard that last response, any comment associated with that. That motion will be overruled. Go on.
(Tr. 928-929).
In this case, the reference to the polygraph test was inadvertent, fleeting, and promptly followed by a curative instruction. A jury is presumed to follow the curative instructions of the trial court. See State v. Loza (1994),71 Ohio St.3d 61, 75; State v. Henderson (1988), 39 Ohio St.3d 24,33. More importantly, there was no mention of the results of the polygraph test. Although Appellant argues that the jury would presume Gatto passed the test, this is only speculation. Given the brief mention of the test, the issuance of a prompt curative instruction, and the fact that the jury did not hear any mention of the test results, we cannot find Appellant was materially prejudiced by the mention of a polygraph test. State v. Spriko (1991), 59 Ohio St.3d 1, 6. Consequently, we cannot find that the trial court abused its discretion in failing to order a mistrial. See, e.g., State v. Garner (1995), 74 Ohio St.3d 49, 59; State v. Holt (1969), 17 Ohio St.2d 81, 83-84; State v. King (June 30, 1997), Washington App. No. 96CA39, unreported. Appellant's first assignment of error is overruled.
Assignment of Error Number Nine
 The trial court erred by permitting Trooper Kevin Smith to state his opinion that prior telephone conversations between Gatto and Mary McCauley were "not inconsistent" with Gatto's trial testimony. The prior statements of Gatto constituted a series of eighty-one telephone calls from his prison which were never played to the jury, constituted improper hearsay and opinion testimony and constituted improper vouching for the credibility of Gatto.
Appellant's ninth assignment of error challenges the admission of testimony of Trooper Smith, wherein the trooper commented on information contained in 81 audio taped conversations between Gatto and Mary McCauley. These conversations were taped in accordance with prison policy, from October 1996 through February 21, 1997.
At trial, Trooper Smith testified that he listened to all the tapes (a task taking over 100 hours of time) and that Gatto never indicated to McCauley that he was planning to dupe authorities into thinking that Chaiffetz was trying to kill his ex-wife in order to help his own case. Nor was there any indication from the taped conversations that the money was being sent to McCauley for real estate, as argued by the defense.
Appellant complains that this testimony was improper hearsay and opinion testimony, the effect of which was to bolster Gatto's credibility before the jury by "laundering" it through a more credible witness, Trooper Smith.
The State contends that the testimony offered by Trooper Smith was admissible as a prior consistent statement of Gatto's under Evid.R. 801(D)(1)(b). Evid.R. 801(D) states:
 A statement is not hearsay if: (1) Prior statement by a witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.
Gatto's testimony at trial, relating the events of Appellant's murder for hire scheme, was attacked by the defense as unbelievable since Gatto was motivated to incriminate Appellant by his fervent desire to get out of prison. Consequently, Gatto was cross-examined at length about his criminal convictions, his history for untruthfulness, and his interest in earning police assistance at his parole hearing.
Gatto first contacted law enforcement via a letter he sent to the Attorney General in February 1997. As a result of this letter, Trooper Smith interviewed Gatto in prison and learned the details of the murder for hire plot. However, because this was just a preliminary interview and Gatto's claims had not been substantiated, Gatto was offered nothing at that time for his information. It was not until later in the investigation, after police had time to corroborate some of Gatto's allegations, that Gatto was offered state assistance at his parole hearing in exchange for his continued cooperation in the case. Thus, it was not until after February 1997 that Gatto could have had a motive to fabricate testimony or evidence.
The conversations Trooper Smith reviewed, between Gatto and McCauley, were taped on the prison monitoring system months before police were alerted to any criminal activity involving Appellant. Given the defense's express charge that Gatto's testimony was nothing but a contrived attempt to falsely implicate Appellant for a crime he did not commit, it was proper for the trial court to allow Trooper Smith's testimony as evidence of Gatto's prior consistent statements. The trooper's report that he heard nothing on the hours of tapes, inconsistent with Gatto's testimony at trial, was admissible pursuant to Evid.R. 801(D)(1)(b) because it was consistent with Gatto's testimony at trial and because it occurred prior to the time Gatto contacted police, requested any state assistance in his case, or was promised any consideration by the OSHP for his information.
Furthermore, Appellant does not contend that he was denied access to these tapes during discovery. We can presume then that Appellant knew the contents of the tapes as well as Trooper Smith. Appellant was given the opportunity to cross-examine the trooper regarding Gatto's statements on these tapes and he had the opportunity to play any portion of the 81 tapes that he believed contradicted Gatto's testimony or otherwise supported his case. Appellant did indeed play portions of 17 tapes to the jury that he believed supported the theory that Gatto, McCauley, and Appellant were engaging in a real estate venture.
Finally, Appellant claims that Trooper Smith could not testify about prior statements of Gatto's because he was not the declarant of the statement. Nothing in Evid.R. 801(D)(1)(b) requires that the prior consistent statement be testified to by the declarant who made the statement rather than a third party who heard the declarant make the statement. See State v. Nichols (1993), 85 Ohio App.3d 65; State v. Bailey (1992), 83 Ohio App.3d 749.
For the foregoing reasons, we find Appellant's ninth assignment of error to be without merit.
Assignment of Error Number Ten
 The trial court erred in ruling that statements made to Bronwen Bello by Appellant, which were remote in time, non-probative and prejudicial, were admissible to rebut lack of predisposition.
It was revealed at trial that in 1975, her first husband, Jay Centifanti, had attacked Bronwen Bello. Centifanti shot Bello five times while she and Appellant were traveling on a commuter train in Philadelphia. Bello survived the attack and later married Appellant in 1983. Meanwhile, Centifanti was prosecuted for shooting Bello and subsequently spent time at the Norristown State Hospital in Pennsylvania.
In an in camera voir dire, Bronwen Bello testified that prior to and during her marriage to Appellant, Centifanti continuously sued her from the state hospital for visitation rights with his children. Bello, supported in her effort by Appellant, resisted Centifanti's attempts for visitation and custody rights. Frustrated that Centifanti might get visitation rights to the children, Bello testified that "[s]everal times he [Appellant] mentioned and urged me to find a hit man to kill Jay Centifanti." Appellant's "hit man" suggestion often came up, according to Bello when "some big legal battle with Mr. Centifanti * * * was intruding in our lives." These intrusions were "* * * several times a year * * * between 1978 and like 1984 or '85."
Following Bello's in camera testimony, the State claimed that if the defense in this case argued an entrapment defense, the State should be allowed to present Bello's testimony to the jury to demonstrate predisposition. Clearly, the State argued, Appellant had the idea that the way to solve a problem involving a person who created troublesome custody disputes was to hire a hit man to kill them. The trial court indicated that it would allow the State to bring in this evidence to rebut an entrapment defense. Appellant claims this ruling was error and that as a result of this decision, he was forced to abandon his entrapment defense.
The decision of the trial court at issue in this assignment of error, reflected the court's anticipated treatment of Bello's testimony in the event of Appellant's anticipated entrapment defense. A final ruling as to admissibility could not be made until Appellant presented his defense and the element of predisposition was put in issue. As such, the ruling, albeit made mid-trial during the State's case in chief, was liminal in nature. Cf. State v. Blair (1990), 70 Ohio App.3d 774.
A liminal ruling is "a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue." State v. Grubb (1986), 28 Ohio St.3d 199, 201-202; McCabe/Marra Co. v. Dover (1995), 100 Ohio App.3d 139, 160. This court does not directly review liminal rulings since they are not final rulings by the trial court. State v. Hill (1996), 75 Ohio St.3d 195, 202-203.
An appellate court need not review the propriety of a tentative, discretionary, interlocutory ruling on an evidentiary issue that is anticipated will arise at trial, "unless the claimed error is preserved by a timely objection when the issue is actually reached during the trial.'" (Emphasis added.) State v. Leslie (1984), 14 Ohio App.3d 343, 344, citing State v. White (1982), 6 Ohio App.3d 1, 4-5; Sanders v. Mt. Sinai Hospital (1985), 21 Ohio App.3d 249, 252; Grubb, 28 Ohio St.3d at 203; State v. Spahr (1976), 47 Ohio App.2d 221. Because Appellant did not proceed with his entrapment defense, the trial court was never called to make a final ruling regarding the admission of Bello's "predisposition" testimony, given the facts and circumstances in evidence at that time. The evidence at issue must be presented at trial, and a proper objection made, in order to preserve the error for appeal. State v. Brown (1988), 38 Ohio St.3d 305, paragraph three of the syllabus. Consequently, Appellant has waived any argument that the trial court erred in its ruling by failing to present his defense and object when the issue of predisposition was actually reached at trial. Appellant's tenth assignment of error is overruled.
Assignment of Error Number Eight
 The trial court erred and violated Appellant's confrontation right by permitting Appellant's ex-wife to read to the jury a written statement that Dr. Chaiffetz's son allegedly read at a custody mediation proceeding in Florida in August of 1996.
In this assignment of error, Appellant complains that the court improperly allowed Bronwen Bello to read to the jury in this case a statement written by his son, David, for use at the August 1996 custody hearing.
The record reveals that while Appellant initially objected to this statement being read to the jury by Bello, he later retracted his objection, with the agreement that the court would not allow Bello to editorialize. Having retracted his objection, Appellant cannot now be heard to complain that the statement was "improperly" allowed to be read at trial. It is well established law that the failure to object "constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Underwood (1983), 3 Ohio St.3d 12, syllabus; State v. Ballew (1996), 76 Ohio St.3d 244, 254. We cannot find that the reading of David's letter so drastically affected the outcome of Appellant's trial. Thus, Appellant's eighth assignment of error is overruled.
Assignment of Error Number Thirteen
 The cumulative evidentiary errors of the trial court deprived Appellant of a fair trial.
Appellant first complains that his character was improperly attacked when Mary McCauley stated to the jury that she thought "the Doctor had expressed an interest and that he would like to know more about dealing drugs." McCauley made this statement in response to pressing questions by Appellant about what exactly she knew in regard to the money she was being sent. McCauley stated that she did not really know what the money was for, but that she thought it was in some way connected to drugs (given Gatto's history in drug trafficking and the fact that Gatto had once told her that Appellant was interested in the drug trade).
We find no error by the trial court here. Appellant elicited this statement through his own questioning on cross-examination. Furthermore, although the State revisited the issue on redirect, Appellant raised no relevant objections to the testimony. Consequently, no "ruling" on the matter ever occurred. Appellant has waived any error here. Ballew, 76 Ohio St.3d at 254.
Next Appellant contends that remarks made by the prosecutor in closing argument were improper. The prosecutor commented that "if this [evidence] isn't sufficient evidence for a Conspiracy to Commit Murder, that there's never sufficient evidence short of the Murder actually taking place." He further stated that defense counsel, no matter how compelling the evidence, always says "there is reasonable doubt." Appellant also complains that it was error for the prosecution to inform the jury during closing argument that the defense elected not to proceed with an entrapment defense.
Again, because Appellant raised no objection to the purportedly improper arguments, his claim of error is waived. Ballew, supra. As stated in State v. Lancaster (1971), 25 Ohio St.2d 83, paragraph one of the syllabus:
 Generally, an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.
(Citation omitted.)
Thus, Appellant's failure to object to the remarks challenged precludes any complaint now on the issue. However, we feel compelled to note that (1) the State's remarks were not improper arguments to be made given the evidence presented to the jury, and (2) no prejudicial effect to Appellant is demonstrated by the record.
Appellant also argues that the court erred in restricting his cross-examination of Gatto. Appellant wanted to question Gatto regarding his understanding of a letter that would purportedly be sent to the parole board by the State on his behalf in exchange for his cooperation in the case. The record does not support the claim that Appellant was restricted in such a manner. Rather, the evidence supports the fact that Appellant was given great latitude when questioning Gatto about his interest in the case and about what he expected from the State in exchange for his cooperation.
Finally, Appellant contends that the court erred when it allowed Trooper Smith to testify that, in his experience as a prison investigator, it is unusual for inmates to be informants and to come forward with evidence of crimes because they fear retaliation by other inmates. Appellant believes this improperly bolstered Gatto's credibility to the jury.
We find no error in this testimony. Trooper Smith had twenty years of experience with the OSHP as well as years of specialized experience in prison investigations. He clearly possessed knowledge on such matters outside the scope of knowledge generally possessed by a lay person. He was qualified to testify about the subject matter of prison informants and how other inmates view them. See Evid.R. 702.
Moreover, the fact that Gatto faced unfavorable treatment by other prisoners if his status as an informant was revealed was relevant to the case. It explained, among other things, why the tape recorder exchanges that took place between Gatto and Trooper Smith were done covertly and why Gatto was removed from the general prison population pending trial in this case. In any case, we find no abuse of discretion in the trial court's decision to allow the testimony. Sage, supra.
Given the foregoing, Appellant's thirteenth assignment of error is overruled.
Assignment of Error Number Six
 The trial court erred when it failed to give the jury instruction mandated by R.C. 2923.01(H)(2) regarding the credibility of co-conspirator testimony.
Assignment of Error Number Seven
 The trial court committed plain error by failing to instruct the jury that the testimony of jail-house informant Gatto was required to be viewed with caution and weighed with great care.
Because these assignments of error both allege error in the jury instructions, we will address them jointly.
Appellant contends that the jury instructions in his case contained two errors. However, the record reflects that Appellant raised no objections to the form or substance of the jury instructions at trial. In fact, Appellant manifested his agreement to the final version of the instructions as presented to the jury.
Crim.R. 30(A) provides that:
 On appeal, a party may not assign as error the giving or failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. * * *
 Similarly, courts have long recognized that failure to timely advise a trial court of possible error, by objection or otherwise, results in a waiver of the issue for purposes of appeal. Underwood, supra; State v. Martens (1993), 90 Ohio App.3d 338, 343; State v. Brownlow (1991), 75 Ohio App.3d 88, 95-96; see Gallagher v. Cleveland Browns Football Co. (1996), 74 Ohio St.3d 427, 436-437. Appellant's failure to object to the jury instructions at trial has effectuated a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been different. Underwood, supra; State v. Long (1978), 53 Ohio St.2d 91, paragraphs one and two of the syllabus. Thus, we will review Appellant's assignments of error under a plain error analysis.
 First, Appellant contends that the trial court erred in failing to give instructions to the jury warning them to regard Gatto's testimony with great caution. Specifically, Appellant claims the instruction on accomplice testimony provided in R.C. 2923.01(H)(2) should have been read to the jury. R.C. 2923.01(H)(2) states:
 If a person with whom the defendant allegedly has conspired testifies against the defendant in a case in which the defendant is charged with conspiracy and if the testimony is supported by other evidence, the court, when it charges the jury, shall state substantially the following:
 "The testimony of an accomplice that is supported by other evidence does not become inadmissible because of the accomplice's complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect the witness' credibility and make the witness' testimony subject to grave suspicion, and require that it be weighed with great caution. * * * "
By the plain language of the statute, the instruction applies when an accomplice to a conspiracy testifies at trial. For the reasons expressed in State v. Marian (1980), 62 Ohio St.2d 250, and State v. Fink (Dec. 21, 1992), Fayette App. No. CA92-01-001, unreported, it is clear that Gatto was not an accomplice nor a co-conspirator to the crime in this case and that the trial court did not commit plain error by failing to give the R.C.2923.01(H)(2) instruction.
In Marian, the Supreme Court of Ohio first recognized the existence of "unilateral" conspiracies in Ohio. The court held that a defendant could be guilty of conspiracy when he planned, with another, the murder of a third person, even though the person with whom the defendant planned the murder, feigns agreement and at no time intends to go through with the plan. Marian, Ohio St. 2d at the syllabus. In such a case, there would be no co-conspirator (since the person feigning agreement would not have the requisite mens rea), and only the defendant would be guilty of conspiracy. This is the case sub judice, wherein Gatto feigned his agreement to the murder for hire scheme.
Not only is Gatto not a co-conspirator in this situation, he is not an accomplice either. "An accomplice is one who fully and voluntarily engages with another in the commission of a crime." Fink, supra, citing State v. Durham (1976), 49 Ohio App.2d 231. Gatto stated at trial that he did not believe Appellant was serious when Appellant first engaged him in conversation about killing Bello. As Appellant tendered what he thought was a down-payment on a contract "hit," McCauley and Gatto promptly squandered the money. When the "hit" did not take place and Appellant began to question Gatto, Gatto stalled Appellant with a story that the hitmen were detained. Gatto subsequently alerted authorities to Appellant's plan. Gatto testified that he never intended to go through with any plan of hiring hitmen to kill Appellant's wife, rather he only continued to act as if he did in order to assist police in gathering evidence against Appellant. For these reasons, the evidence supports the fact that Gatto did not "fully and voluntarily engage with another in the commission of a crime." Thus, because Gatto was not a co-conspirator or accomplice testifying against Appellant, the instruction in R.C.2923.01(H)(2) was not required to be given to the jury.
Furthermore, Appellant's claim that a cautionary instruction regarding government informers should have been read to the jury is also without merit. The court was not bound by any statute to issue such an instruction. Although the court in United States v. Griffin (C.A.6, 1967), 382 F.2d 823, found plain error in the court's failure to give a special cautionary instruction to the jury as to the credibility of the informant in that case, this decision was clearly based on the fact that there was no corroborating evidence to support the informant's testimony. Id. at 828. Griffin does not require a special instruction in all cases involving informant testimony; the need for the instruction depends on the circumstances of the case. United States v. Brown (C.A.6, 1991), 946 F.2d 1191, 1195. In Brown, the court found that the trial court's general instructions on credibility provided sufficient protection, and the court did not err in failing to give the requested informant instruction since given the corroborating evidence, it was clear the informant could not have manufactured all of the evidence against the defendant. Id.; State v. Draughn (1992), 76 Ohio App.3d 664, 675, citing United States v. McGhee (C.A.6, 1989), 882 F.2d 1095 (no instruction required where informant's testimony was corroborated by electronic surveillance and evidence from a search).
In this case, there was independent police corroboration of the information reported by Gatto. Police were able to trace payments made to McCauley back to Appellant, even though Appellant had taken great effort in concealing his identity and the origin of the monies. Police also corroborated Gatto's information by giving Gatto instructions to advise Appellant to send photographs of his ex-wife to a Cleveland post office box so the "hitmen" would know what she looked like. These photographs were mailed to Cleveland and recovered by police. Although Appellant denied mailing them, a handwriting expert identified "similarities" between the handwriting on the envelope and Appellant's known handwriting. Furthermore, there was no persuasive evidence presented to support any allegation that Gatto, himself, sent the photo's from prison. Finally, the information Gatto gave to police was corroborated when Gatto wore a wire and taped incriminating statements made by Appellant regarding the plan to kill Bello. The strong corroborating evidence in this case supported Gatto's testimony to the degree that no further instruction about informant credibility was required in this case.
Given the foregoing, we find no plain error in the jury instructions given to the jury by the court. Appellant's sixth and seventh assignments of error are overruled.
Assignment of Error Number Eleven
 It was plain error not to declare a mistrial when defense counsel notified the court that the defense would withdraw its request for an entrapment instruction.
Appellant claims that a mistrial should have resulted when counsel for the defense withdrew its request for an entrapment instruction.
In State v. Reynolds (1988), 49 Ohio App.3d 27, 33, the court held:
 A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court.
We find no error in the trial court's failure to, sua sponte, declare a mistrial in this case. As we have previously concluded, the rulings made by the trial court on evidentiary issues were not improper and were within the court's discretion on such issues. Furthermore, although the jury was alerted during voir dire and at the opening of the case, that entrapment was a defense relevant to the case, the jury heard no evidence supporting such a defense. While the facts of a case and the court's rulings at trial always affect the strategic and tactical decision-making of counsel, it is not an "error" prejudicial to Appellant that the evidence does not support some defense or that the trial court makes proper evidentiary rulings that causes defense counsel to decide to abandon a line of defense. In this case, Appellant made the calculated decision to abandon a defense. We must accord deference to defense counsel's strategic choices. Strickland v. Washington (1984), 466 U.S. 668, 689.
Moreover, Appellant's complaint that "the failure to instruct on entrapment gave the jury the erroneous impression that Appellant had no credible defense to present" is refuted by the record. The defense presented evidence and argument that Appellant never intended to kill his ex-wife, that his only involvement with Gatto and McCauley was in connection with a potential business investment in real estate, and that Gatto was lying in order to get State assistance with parole. Clearly, counsel for Appellant did not abandon all defenses, only one in particular and for reasons that he likely considered beneficial at the time.
For the reasons stated, a mistrial was not warranted. Appellant's eleventh assignment of error is overruled.
Assignment of Error Number Fifteen
 The conviction of Appellant should be reversed because there was insufficient evidence in the record to sustain a verdict of guilty.
In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court of Ohio discussed the standard for reviewing a claim of insufficient evidence, noting that the legal concepts of sufficiency of the evidence and weight of the evidence were different. The Supreme Court stated:
 With respect to sufficiency of the evidence, " 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing Jackson v. Virginia (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
Id. at 386-387.
In this case, the State did present sufficient evidence to sustain a conviction for Conspiracy to Commit Murder, pursuant to R.C. 2923.01(A).
R.C. 2923.01(A) provides:
 No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, * * * shall do either of the following:
 (1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
 (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.
Previously in this opinion, we have outlined the relevant facts as presented at trial. Whether these facts are contested by Appellant or not, is not relevant to the issue of sufficiency of the evidence. There can be no doubt that the State presented evidence on all elements of the offense charged and that, if believed, such evidence was legally sufficient to sustain a conviction. Consequently, we find Appellant's fifteenth assignment of error to be without merit.
Assignment of Error Number Fourteen
 The nine year sentence in this case was unreasonably harsh and does not reflect a reasonable balancing of the factors set forth in R.C. 2929.11.
According to R.C. 2929.11(A), the two overriding purposes of felony sentencing are to protect the public from future crime and to punish the offender. When sentencing an offender, the trial court is granted broad discretion in determining the most effective way to uphold these objectives. R.C. 2929.12(A). The court is guided in its discretion by subsections (B),(C),(D) and (E) of R.C. 2929.12, which enumerate factors the court should consider when judging the seriousness of the conduct constituting the offense and the likelihood of the offender's recidivism.
The record in this case reveals that the trial court agreed with the findings argued by the State as to the factors set out in R.C. 2929.12. Facts indicating that Appellant's conduct was more serious than conduct normally constituting the offense include the fact that Appellant's intended victim suffered psychological harm (R.C. 2929.12(B)(2)); Appellant used his occupation as a medical doctor, a position of trust, to facilitate the offense, while at the same time he was obligated to report such offenses to the administration at N.C.C.I. (R.C. 2929.12(B)(3), (4) and (5)); Appellant's relationship with the victim facilitated the offense (R.C. 2929.12(B)(6)); and Appellant committed the offense for hire or as a part of an organized criminal activity (R.C.2929.12(B)(7)). Furthermore, Appellant's lack of remorse for the offense was a factor indicating a greater likelihood of recidivism. R.C. 2929.12(D)(5).
Although Appellant had never served a prison term, a fact which, absent other findings, mandates the imposition of the shortest allowable prison term on a defendant convicted of a felony, pursuant to R.C. 2929.14(B), the trial court specifically found on the record that the imposition of the shortest prison term would demean the seriousness of Appellant's conduct. After making this finding, the court imposed a nine year prison term and a $20,000 fine.
We recognize that the trial court has broad discretion in determining the most effective way to comply with the purposes and principles of sentencing, and in considering the factors in R.C.2929.12. The trial court herein considered the factors in R.C.2929.12 before imposing sentence. The sentence was within the statutory limits described in R.C. 2929.14. Consequently, we find no error in the trial court's judgment of sentence. Appellant's fourteenth assignment of error is overruled.
Having found no error prejudicial to the Appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed.
BRYANT, P.J., and HADLEY, J., concur.